THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD A. MYERS, *ET AL.* | |
| Plaintiffs, | |
| | CIVIL ACTION NO.: 3:03-CV-00373 (RNC) |
| V. | |
| TOWNSHIP OF TRUMBULL, *ET AL.* | |
| Defendants. | MAY 28, 2004 |

**AFFIDAVIT OF LEN MAENZA
FILED IN SUPPORT OF DEFENDANT
WESTFIELD SHOPPINGTOWN TRUMBULL'S
(IMPROPERLY IDENTIFIED AS WESTFIELD SHOPPINGTOWN)
MOTION FOR SUMMARY JUDGMENT**

I, Len Maenza, being duly sworn, according to law, upon his oath, deposes and says:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I make this affidavit based upon my personal knowledge and in support of the defendant Westfield Shoppingtown Trumbull's motion for summary judgment.

3. I am, and at all times material hereto have been, employed by Westfield Corporation, Inc. ("Westfield Corporation").

4. I was the General Manager at Westfield Shoppingtown Trumbull ("the Trumbull Mall"), located at 5065 Main Street, Trumbull, Connecticut, from August 1998 to October 2003, including on July 31, 2001 at the time of the incident alleged in Plaintiffs' Amended Complaint. I am presently the General Manager at Westfield Shoppingtown Montgomery, an enclosed regional mall located in Bethesda, Maryland.

5. On July 31, 2001, and at all times material hereto, the Trumbull Mall was owned and possessed by Trumbull Shopping Center #2, LLC ("TSC"), a Delaware limited liability company, which has a principal place of business at 11601 Wilshire Boulevard, Los Angeles, California. TSC is registered to conduct business in Connecticut.

6. Westfield Shoppingtown Trumbull is a registered trade name for the mall owned by TSC. The Trumbull Mall is the only mall owned by TSC.

7. On July 31, 2001, and at all times material hereto, the Trumbull Mall was managed by Westfield Corporation.

8. At all times material hereto, the property on which the Trumbull Mall is located has been private property.

9. At the time of the incident alleged in Plaintiffs' Amended Complaint, Westfield Corporation had contracted with Spectaguard Acquisitions, LLC ("Spectaguard"), pursuant to which contract Spectaguard agreed to provide Westfield Corporation with security services at the Trumbull Mall. A true and accurate copy of the Standard Contractor's Service Agreement (the "Agreement") between Westfield Corporation and Spectaguard is attached hereto as Exhibit A. The Agreement was in effect from February 1, 2000 through January 31, 2002.

10. On July 31, 2001, no employee of Westfield Corporation or TSC performed security services at the Trumbull Mall. All security services at the Trumbull Mall were performed by employees of Spectaguard.

11. At all times while the Agreement between Westfield Corporation and Spectaguard was in effect, Spectaguard was solely responsible for supervising the

activities of its labor, employees, contractors, and subcontractors with respect to the rendering of all services under the Agreement, including determining the best methods for rendering those services.

12. At all times while the Agreement between Westfield Corporation and Spectaguard was in effect, Westfield Corporation considered Spectaguard to be an independent contractor for Westfield Corporation.

13. At no time during the pendency of the contract between Westfield Corporation and Spectaguard did Westfield carry insurance for Spectaguard or its employees. Pursuant to the terms of the contract between Westfield Corporation and Spectaguard, Spectaguard was obligated to obtain commercial general liability insurance coverage relating to the security services it was to perform, and Spectaguard was obligated to name Westfield Corporation and TSC as additional insureds on any such insurance. Additionally, Spectaguard is obligated to defend and indemnify Westfield Corporation and TSC for any and all claims or losses arising from security services Spectaguard provided for Westfield Corporation.

14. On July 31, 2001, the Westfield Shoppingtown Trumbull Mall was open during the hours of 10:00 a.m. to 9:30 p.m.

15. At no time during the incident alleged in Plaintiffs' Amended Complaint was any manager, employee or representative of Westfield Corporation or TSC present at the scene of any of the activity giving rise to plaintiffs' claims in this case, nor was any manager, employee or representative of Westfield Corporation or TSC aware of any of the activity giving rise to plaintiffs' claims.

16.     As General Manager of the Trumbull Mall, I learned of the incident upon which the plaintiffs base their claims in this case when an employee of Spectaguard provided Westfield Corporation with a copy of a security report prepared by a Spectaguard employee the day following the incident.

I certify under penalty of perjury that the foregoing is true and accurate.

Executed this 28th day of May 2004.

_____
LEN MAGNZA

Subscribed and sworn to me this 28 day of May, 2004.

_____
Notary Public/Commissioner of the Court

My Comm. Exps. 9/1, 2006

MaenzaAffidavitRev52804.doc

MaenzaAffidavitRev52804.doc



EXHIBIT A

## STANDARD CONTRACTOR'S SERVICE AGREEMENT

This AGREEMENT ("AGREEMENT") is entered into this _____ day of _____ 19___ between WESTFIELD CORPORATION, INC. ("MANAGER") and SPECTAGUARD ACQUISITION, LLC ("CONTRACTOR") License Number AS1946 for the performance of services on the property commonly known as WESTFIELD SHOPPINGTOWN TRUMBULL (the "SHOPPING CENTER"). The owner of certain portions of the shopping center is Westland Properties, Inc., a Delaware corporation (the "OWNER").

MANAGER and CONTRACTOR MUTUALLY AGREE as follows:

1. **TERM.** This AGREEMENT will become effective on the 1st day of February, 2000, and will continue in effect until the 31st day of January, 2002, or until terminated as provided in this AGREEMENT.

2. **CONTRACTOR'S SERVICES.**

CONTRACTOR agrees to perform the following services: SHOPPING CENTER SECURITY as further described in EXHIBIT "A" which describes services and scope of work.
These services are hereinafter called "SERVICES".

CONTRACTOR agrees to perform in good and workmanlike manner, and to furnish at its sole cost and expense all personnel, labor, materials, supplies, equipment, services, administrative services, machinery, tools and other facilities required for the prompt and efficient execution of the SERVICES in strict compliance with this AGREEMENT, all applicable laws, ordinances and regulations, including, without limitation, all of the licenses and permits required by all governmental agencies to perform the SERVICES. CONTRACTOR agrees and warrants, in connection with all Services required by this Agreement, that it will not violate, and shall at its sole cost and expense, comply with all applicable laws, ordinances, regulations and orders of governmental authorities, whether enacted and in force now or in the future.

CONTRACTOR shall designate a representative of Contractor at the Shopping Center.

CONTRACTOR agrees that the labor and materials needed to complete the services required by this AGREEMENT are not improvements to real property, or other work allowing CONTRACTOR to file and/or record a mechanic's lien against the Shopping Center. CONTRACTOR, therefore, waives any right to file or record any mechanic's or materialmen's liens, and waives any and all claims that such labor and materials are improvements to real property, or other work allowing CONTRACTOR to file and/or record a mechanic's or materialmen's lien against the Shopping Center.

MANAGER is not a supervisor or foremen with respect to Contractor and its labor and employees. Contractor is completely responsible for supervising the activities of its labor, employees, contractors and subcontractors with respect to the subject matter of this contract, including but not limited to the Services. During the negotiation of this contract, Manager has required evidence of Contractors qualifications, its training programs and the services offered and is executing this contract based on those representations. Manager expects Contractor to implement those representations as part of the Services provided. Communications and notices concerning this contract should be sent directly to Manger's home office at the address indicated on the attachment to this contract. Contractor and Manager will mutually work out appropriate hours for the Services to be provided and appropriate Contractor labor and employees and subcontractors to perform such services. Once such schedules are agreed upon, Contractor agrees to abide by such schedules and provide all Services in accordance with the schedules.

3. **CONTRACT PRICE.** For the strict, NOT substantial, performance by CONTRACTOR of all of its obligations under this AGREEMENT, MANAGER will pay CONTRACTOR $712,718 annually, including Connecticut Sales & Use Tax for the first 12 months of the contract period, and $731,791 annually including Connecticut Sales & Use Tax for the second 12 months of the contract period ("CONTRACT PRICE"). The CONTRACT PRICE includes all increases in costs, whether foreseen or unforeseen, including, without limitation, taxes, labor, materials, and transportation costs. CONTRACTOR will be responsible for all loss of or damage to the SERVICES by any and all obstructions, difficulties or delays, or by the action of the elements.

The CONTRACT PRICE will be payable at the rate of $59,393 per month for the first 12 months of the contract period, and $60,983 for the second 12 months of the contract period in payment for the strict performance of this AGREEMENT. No part of the CONTRACT PRICE shall be due for work not actually completed or performed, and accepted by MANAGER.

Should any governmental authority require a change in the SERVICES, CONTRACTOR will make the required changes without any additional charge to MANAGER.

All labor, materials and equipment furnished by CONTRACTOR shall be deemed to be included within the CONTRACT PRICE even though such labor, materials and equipment are not specifically required or demanded in this AGREEMENT.

The CONTRACT PRICE includes the payment by CONTRACTOR of any charges for licenses or permits, or any tax under Sales or Use Tax Law, or any amendments thereto, or any law now existing, or which may thereafter be adopted by Federal, State, Local or other governmental authority, taxing the materials, Services required, or labor furnished, or any other tax levied by reason of the Services.

_____          _____
CONTRACTOR INITIALS              MALL INITIALS

(Rev. 12/98)

3.1 **PAYMENTS.** Provided CONTRACTOR is in strict and full compliance with every provision of this CONTRACT, MANAGER agrees to pay CONTRACTOR the monthly payments described above.

CONTRACTOR agrees, as a condition precedent to each progress payment hereunder, that it shall have paid to each of its subcontractors, materialmen and laborers within three (3) business days of receipt by CONTRACTOR from MANAGER of amounts attributable to such portions of the Services, all such amounts due and CONTRACTOR shall not withhold from its subcontractors, materialmen or laborers, an amount greater than that withheld by MANAGER. It is understood that the full and faithful performance of this CONTRACT on the part of the CONTRACTOR (including the payment of any obligations due from CONTRACTOR to MANAGER, and any amount due to labor or materialmen furnishing labor or material for said work) is a condition precedent to CONTRACTOR'S right to receive payment for the Services performed.

4. **TERMINATION OF AGREEMENT.**

4.1 CONTRACTOR shall promptly take all action necessary to fully comply with the terms of this AGREEMENT within twenty-four (24) hours after MANAGER gives written notice that CONTRACTOR's performance under this AGREEMENT is unsatisfactory, that CONTRACTOR has failed to comply fully with the terms of this AGREEMENT, or that the SERVICES need correction or repair. Should CONTRACTOR fail to fully comply with the terms of this AGREEMENT within twenty-four (24) hours, MANAGER may terminate this AGREEMENT. In the event of such termination, MANAGER, at CONTRACTOR'S expense may (a) eject CONTRACTOR; (b) take possession of all materials, appliances, tools and equipment already on the Shopping Center, and all rights under the subcontracts and material supply AGREEMENTS of CONTRACTOR; and (c) secure the materials and labor necessary to complete the SERVICES. However, nothing herein is intended to restrict Manager's rights and remedies against Contractor for breach of this Agreement.

4.2 MANAGER reserves the right to terminate this AGREEMENT in the event that the Shopping Center is damaged or destroyed by fire or other catastrophe, or is condemned, in whole or in part, or if the Shopping Center is sold or otherwise transferred by Owner. In the event of such termination, MANAGER shall pay CONTRACTOR the pro-rata portion of the CONTRACT PRICE, which reflects the value of SERVICES actually completed in proportion to the CONTRACT PRICE as of the date of termination. MANAGER will deduct from such sums the amount of any payments made to CONTRACTOR prior to the termination of this AGREEMENT. CONTRACTOR will not have any claim or lien against MANAGER for any additional compensation or damages in the event of such termination. Manager reserves the right to terminate this Agreement in the event that the Shopping Center is sold or otherwise transferred by the Owner.

4.3 This AGREEMENT may be canceled by either party without cause by the giving of a Thirty (30) Days Notice of Cancellation in writing; provided that if CONTRACTOR terminates this AGREEMENT and if MANAGER cannot reasonably replace CONTRACTOR'S services with similar services at the same price, CONTRACTOR will continue to provide such services for six (6) months from its notice of cancellation or until Contractor receives a Second Notice of Cancellation in writing, whichever event first occurs.

5. **CONTRACT PROVISIONS.** This written Standard Contractor's Service Agreement constitutes the entire AGREEMENT between MANAGER and CONTRACTOR (except for modifications or amendments issued after execution of this Agreement), consist of this document, the General Contract Provisions as set forth in the attachment and the Description of Services set forth in Exhibit "A". This AGREEMENT may be modified or amended only by a writing signed by both parties.

Any person executing this AGREEMENT as an agent of either CONTRACTOR or MANAGER represents and warrants that he/she is authorized to execute this AGREEMENT, and has the power to bind his/her respective principal to the terms, conditions and covenants of this AGREEMENT. CONTRACTOR and MANAGER acknowledge that the other is relying on this warranty and representation in executing this AGREEMENT.

(CONTRACTOR)

BY: _[signature]_

TITLE: _[illegible]_

Tax I.D. Number: _____

X Corporation
___ Partnership
___ Proprietorship

MANAGER:
WESTFIELD CORPORATION, INC.
A Delaware corporation

BY: _[signature]_
Gary Karl
Senior Vice President – Center Management
East/Mid West

2

## GENERAL PROVISIONS

6. **OBJECTIONABLE EMPLOYEES.** CONTRACTOR acknowledges and agrees that MANAGER'S business and the business of the Shopping Center's occupants may be adversely affected by the poor performance, poor appearance or disruptive conduct of CONTRACTOR'S personnel while furnishing the services required by this AGREEMENT. Accordingly, CONTRACTOR shall not assign to or retain at the Shopping Center any employee about whom MANAGER or OWNER reasonably objects based on the employee's poor appearance, inadequate qualifications or performance or disruptive conduct. CONTRACTOR will not assign to or retain at the Shopping Center any employee who is incompatible with the balance of the work force at the Shopping Center or who will cause, or whose presence will cause labor disputes or work stoppages. In the event any of CONTRACTOR's employees causes a labor dispute or work stoppage, CONTRACTOR will immediately remove such employees from the Center, provided that CONTRACTOR will not be obligated to take such action if in violation of any federal, state or local law, regulation, ordinance or order.

7. **DISRUPTIVE OPERATIONS.** CONTRACTOR agrees that its Services shall be scheduled and performed only as authorized by MANAGER in MANAGER'S sole and absolute discretion. If MANAGER determines that work proposed by CONTRACTOR will be disruptive if performed while the Shopping Center is open for business, then CONTRACTOR shall perform the proposed work during times when the Shopping Center is not open for business as MANAGER may direct.

8. **STORAGE OF EQUIPMENT OR MATERIALS.** CONTRACTOR shall not store any equipment or materials at the Shopping Center without the express written consent of MANAGER except as otherwise herein provided.

9. **CONTRACTOR'S INVESTIGATION.** CONTRACTOR acknowledges that it has made a complete and independent investigation of the Shopping Center, and all conditions which might affect the progress, safety or quality of the SERVICES. The CONTRACT PRICE set forth in Paragraph 3 includes all Services which may be performed by CONTRACTOR to overcome any unanticipated conditions. Any information which may have been furnished to CONTRACTOR by MANAGER about the Shopping Center is for the convenience of CONTRACTOR only, and MANAGER does not warrant that the Shopping Center or conditions are as indicated. Throughout the term of this AGREEMENT, CONTRACTOR shall pay all taxes, fees and assessments (and comply with all filing requirements) which may be imposed by any governmental authority upon the equipment, supplies, and other property of CONTRACTOR, if any, utilized in connection with CONTRACTOR'S Services, the business of CONTRACTOR and the income or earnings of CONTRACTOR'S business.

10. **TIME.** CONTRACTOR agrees to punctually, diligently and fully perform all of the SERVICES at the time scheduled by MANAGER, which shall be subject to change by MANAGER as it deems, in its sole discretion, necessary or convenient to the overall operation and maintenance of the Shopping Center.

11. **INSPECTION AND APPROVALS.** The SERVICES shall be subject to inspection and approval by MANAGER and all applicable governmental authorities; provided, however, in no event shall any such inspection and/or approval by MANAGER constitute an assumption of Contractor's duties and obligations or a waiver or release of liability or a release of any other obligations whatsoever of CONTRACTOR with respect to the SERVICES performed by CONTRACTOR pursuant to this AGREEMENT.

12. **INTERRUPTION OF WORK.** If, as a result of fire, earthquake, acts of God, war, strikes, picketing, boycott, lock-outs, or other causes or conditions beyond the control of MANAGER, or if MANAGER shall consider it inadvisable for CONTRACTOR to proceed with the SERVICES, then CONTRACTOR shall, upon receipt of written notice from MANAGER, immediately discontinue any further SERVICES until such time as MANAGER may deem it advisable to resume the SERVICES. CONTRACTOR will resume the SERVICES promptly upon receiving written notice from MANAGER to do so, and CONTRACTOR shall not be entitled to any damages or compensation during the period of or on account of cessation of the SERVICES as a result of any of the causes mentioned above. This Paragraph shall not be construed as conferring upon CONTRACTOR the right to strike, picket, boycott or conduct lockouts in connection with the SERVICES.

13. **CORRECTION OF DEFECTS.** All defects in SERVICES shall be corrected immediately by CONTRACTOR to the satisfaction of MANAGER without cost to MANAGER. In the event such SERVICES are not corrected, MANAGER may withhold any payment due hereunder until such SERVICES are corrected to the MANAGER'S satisfaction. If the Services must be corrected by Manager or a third party, Contractor shall not receive any compensation for such services.

14. **INSURANCE**

   14.1 Before CONTRACTOR performs any SERVICES at or prepares or delivers material to the SHOPPING CENTER, CONTRACTOR will provide original Certificates of Insurance and endorsements evidencing the following coverages by an insurance carrier satisfactory to the Manager authorized and licensed to provide such coverages in the state in which the SHOPPING CENTER is located:

   (1) Statutory Worker's Compensation insurance as required by the laws of the state in which the SERVICES are to be performed;

   (2) a. Commercial General Liability Insurance, on an "occurrence" basis, or policy equivalent thereof, and including Completed Operations coverage, with limits of not less than $3,000,000 each occurrence Combined Single Limit (CSL)/$5,000,000 General Aggregate.

   b. Automobile Liability Insurance Including Bodily Injury and Property Damage coverage with limits of not less than $3,000,000 each occurrence Combined Single Limit (CSL).

   (3) Employer's liability in the amount of $1,000,000 each accident, $1,000,000 each employee, $1,000,000 policy aggregate by disease.

   (4) Contractually Assumed Liability coverage specifically covering CONTRACTOR for all liability loss, cost and damages, including attorneys fees, assumed by CONTRACTOR and CONTRACTOR's obligation to protect, defend and indemnify MANAGER as set forth under the provisions of this AGREEMENT.

   (5) When the SERVICES of CONTRACTOR involve any subsurface activities, coverage for explosion, collapse and underground hazard (XCU) with the limits not less than $3,000,000 per occurrence.

_____        _____
Contractor Initials                               Mall Initials

3

14.2 Except for Workers compensation, the insurance policies required by Paragraph 14.1 shall name, by endorsement the OWNER, MANAGER, and the affiliates of any of them or any successors thereto as additional insureds (the "ADDITIONAL INSUREDS") and shall include the following clause: "The insurance afforded to each ADDITIONAL INSURED is primary insurance. If the ADDITIONAL INSURED has other insurance which is applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance." CONTRACTOR shall within twenty (20) days after the execution date of this AGREEMENT, provide to MANAGER copies of formal policy endorsements as required pursuant to Section 14 of this AGREEMENT. Each Certificate of Insurance shall evidence that each insurance policy fully insures the ADDITIONAL INSUREDS and that each such insurance policy shall not be subject to any deductible or self-insured retention, it being the intent of the parties that the insurance shall fully insure the ADDITIONAL INSUREDS from the first dollar of any claimed loss.

14.3 At CONTRACTOR'S sole cost and expense, the insurance policies required by Paragraph 14.1 shall insure any ADDITIONAL INSUREDS against any and all losses arising from, related to or in connection with: (1) the SERVICES, or the failure to perform the SERVICES (2) any condition, loss or damage for which the CONTRACTOR and any ADDITIONAL INSUREDS may be jointly or severally liable, (3) any claim made against any ADDITIONAL INSUREDS in connection with the activities of or failure to act of an employee or contractor or subcontractor of CONTRACTOR irrespective of whether such employee is a loaned employee to or borrowed servant of an ADDITIONAL INSURED, (4) any actions of or failure to act of the CONTRACTOR, and (5) any other loss that is or may be covered by the insurance policy. Such insurance shall be effective irrespective of whether the loss or claim took place after completion of the SERVICES or at a time that CONTRACTOR or its insurance company claims to be unrelated to the SERVICES.

14.4 The insurance policies required by Paragraph 14.1 shall provide that the required coverages will not be canceled or materially reduced except by written notice to MANAGER given at least thirty (30) days prior to the effective date of such cancellation or reduction. In the event the coverage evidenced by any of the Certificate(s) is canceled or reduced, CONTRACTOR shall procure new insurance policies, and shall furnish to MANAGER before the effective date of such cancellation, Certificates, and/or endorsements as set forth hereinabove, conforming to the above requirements.

14.5 If the insurance policies required by Paragraph 14.1 are not available on other than a "claims made" basis, CONTRACTOR will, upon cancellation or non-renewal of such policy, purchase an extended reporting ("long-tail") endorsement. This endorsement shall extend the reporting period for making claims under the expiring claims made general liability policy for a period of not less than 12 months following the expiration of any "occurrence based" policy, or more if reasonably obtainable, and CONTRACTOR shall be obligated to advise MANAGER in writing that such a "long-tail" endorsement has been obtained and the duration of same.

14.6 Should CONTRACTOR fail to obtain any insurance coverage, or to provide any Certificate, required by Paragraph 14.1, or should CONTRACTOR fail to timely renew any such insurance coverage, MANAGER shall have the right, at MANAGER's election: (a) to obtain such coverage on CONTRACTOR's behalf, at CONTRACTOR's expense, from any insurance carrier selected by MANAGER in MANAGER's sole discretion, and to offset the costs and premiums for such insurance against any sums payable to CONTRACTOR under this AGREEMENT; or (b) to terminate this AGREEMENT; or (c) take any and all such other action which may be provided for by law or equity.

15. INDEMNIFICATION.

15.1 CONTRACTOR agrees to indemnify, defend, protect and hold OWNER, MANAGER or any other management company hired by OWNER and the partners, affiliates, shareholders, representatives, agents, officers and directors, employees and successors-in-interest of any of them (the "INDEMNITEE"), harmless, from and against any and all claims, losses, proceedings, damages, causes of action, liability, injury, swards, fines, judgements, costs and expenses (including but not limited to reasonable attorneys' fees) arising from, related to or in connection with, or caused by: 1) the SERVICES to be provided hereunder, or 2) the failure to provide the SERVICES, including any of the same regardless of whether same shall occur after the completion of the SERVICES or 3) any condition or loss for which any of the INDEMNITEES and CONTRACTOR may be jointly or severally liable or (4) any claim made against any INDEMNITEE in connection with the activities or failure to act of any employee or contractor or subcontractor of CONTRACTOR, irrespective of whether such employee is a loaned employee to or a borrowed servant of an Additional Insured. The foregoing indemnity shall apply regardless of whether any claims, losses, proceedings, damages, causes of action, liability, injury, swards, fines, judgements, costs and expenses are caused in part by an INDEMNITEE. In any and all claims against an INDEMNITEE or any of its agents or employees by any employee of CONTRACTOR, or any contractor or subcontractor (or sub-subcontractors), anyone directly or indirectly employed by or hired by any of them or anyone for whose acts any of them may be liable, the indemnification obligation required pursuant to this Section 15 shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for CONTRACTOR or any contractor or subcontractor (or sub-subcontractors) under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts. Such indemnity shall survive the termination of this AGREEMENT and shall be binding upon CONTRACTOR, and its successors and assigns, until all applicable statutes of limitations have run.

15.2 In the event an INDEMNITEE has occasion to tender any claim or defense to CONTRACTOR or request indemnity from CONTRACTOR for any claim or action arising from or related to the SERVICE, as previously described at Paragraph 15.1, CONTRACTOR hereby agrees to notify MANAGER or MANAGER'S insurance carrier, in writing, within twenty (20) days from said tender, as to whether CONTRACTOR accepts or rejects said tender or request for indemnity.

15.3 CONTRACTOR shall provide evidence that the insurer providing coverage under Section 14 waives their right of subrogation against OWNER, MANAGER, and the affiliates of any of them or any successors thereto. If CONTRACTOR refuses to indemnify any indemnitee against any such claim and the indemnitee prevails in an action to enforce the CONTRACTOR'S indemnity, the CONTRACTOR shall pay all reasonable attorneys' fees and expenses and other court costs, witness fees and the like incurred by any indemnitee to enforce the indemnity and defend the claim and shall pay any judgment or damages entered on the claim against any indemnitee.

16. LIENS: To the fullest extent permitted by law, CONTRACTOR shall at all times, indemnify and hold OWNER and MANAGER, its general and limited partners, Westfield Corporation, Inc., OWNER's lender and such other parties as OWNER and MANAGER may request and their respective agents, directors, officers, employees and servants harmless against all liability for claims and liens for labor performed or materials used or furnished to the SHOPPING CENTER to be used in connection with the Services, including but not limited to any costs and expenses for attorney's fees and all incidental or consequential damages resulting from such claims or liens. Contractor shall pay when due all valid charges for labor and material incurred by CONTRACTOR and used in connection with the Services and, shall also be responsible for keeping the SHOPPING CENTER free of mechanic's liens recorded by or under CONTRACTOR or his subcontractors. Further, in case suit on such claim is brought CONTRACTOR shall defend said suit at his own cost and expense, and will pay and satisfy any such lien or judgment as may be established by the decision of the court and said suit. CONTRACTOR agrees within ten (10) days after written demand to cause the effect of any suit or lien to be removed of record from the SHOPPING CENTER, and in the event CONTRACTOR shall fail so to do, MANAGER is authorized to use whatever means in its discretion it may deem appropriate to cause said lien or suit to be removed or dismissed and the cost thereof, together with reasonable attorney's fees shall be immediately due and payable to MANAGER by CONTRACTOR.

Contractor Initials _____   Mall Initials _____

4

17. **INDEPENDENT CONTRACTOR RELATIONSHIP.** The relationship of CONTRACTOR to MANAGER during the term of this AGREEMENT shall be that of an independent contractor. CONTRACTOR shall remain and maintain said independent contractor relationship, and CONTRACTOR shall at no time be considered an employee or agent of MANAGER or OWNER.

18. **DEATH OR DISABILITY OF CONTRACTOR.** If CONTRACTOR is a sole proprietor, or if CONTRACTOR is a corporation in which the members of the same family own seventy-five percent (75%) or more of the outstanding stock, the death or disability of the sole proprietor or the principal stockholder shall terminate this AGREEMENT at the option of MANAGER.

19. **SAFETY.** CONTRACTOR shall at his own cost and expense protect his own employees, employees of MANAGER, and all other persons from risk of death, injury or bodily harm arising out of or in any way connected with the SERVICES. CONTRACTOR shall strictly comply with all safety orders, rules, regulations or requirements of all federal, state and local government agencies exercising safety jurisdiction over said SERVICES including, but not limited to, the federal and state OSHA regulations. CONTRACTOR shall, at all times continually and diligently patrol and observe any area in which the SERVICES are being or are to be performed, as well as any area through which CONTRACTOR'S employees travel, to detect and safeguard against any litter, debris, spills or other hazardous conditions. CONTRACTOR shall have the primary obligation to guard against any hazard to person or property.

20. **HAZARDOUS MATERIALS.**

  20.1 For the purposes of this Paragraph the following terms shall have the following meanings: (a) the term "Hazardous Material" shall mean: (i) any material or substance that, whether by its nature or use, is subject to regulation by any governmental body or agency, or (ii) any material, substance or waste which is toxic, ignitable, explosive, corrosive or reactive, or (iii) asbestos, or (iv) petroleum and petroleum-based products, or (v) formaldehyde, or (vi) polychlorinated biphenyls (PCBs), (vii) freon and other chlorofluorocarbons or (viii) such other material as is designated in a notice from MANAGER or OWNER to CONTRACTOR (whether such notice is provided before or after CONTRACTOR first commences to use such material). (b) the term "Environmental Requirement" shall include the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), the Toxic Substances Control Act (15 U.S.C. §2601 et seq.), the Clean Air Act (42 U.S.C. §7401 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), all as presently in effect and as the same may hereafter be amended, any regulation pursuant thereto, or any other present or future law, ordinance, rule regulation, order or directive addressing environmental, health or safety issues of or by any governmental body or agency.

  20.2 CONTRACTOR hereby represents and warrants to MANAGER and OWNER that it will insure that (i) no Hazardous Material will be used, generated, manufactured, sold, transported or located at, on, in, under or about the Shopping Center; (ii) no Hazardous Materials will be used, generated, manufactured, sold, transported or located at, in, on, under or about the Shopping Center in a manner which violates any Environmental Requirement, or which requires cleanup or corrective action of any kind under any Environmental Requirement and (iii) no Hazardous Material will be transported, released, emitted, sold, discharged, leached, dumped or disposed of from the Shopping Center onto or into any other property.

  20.3 CONTRACTOR shall notify MANAGER or OWNER promptly in the event of any spill or other release of any Hazardous Material at, in, on, under or about the Shopping Center which is required to be reported to a governmental body or agency under any Environmental Requirement, will promptly forward to MANAGER or OWNER copies of any notices received by CONTRACTOR relating to the alleged violations of any Environmental Requirement and will promptly pay when due any fine or assessment against CONTRACTOR, MANAGER, OWNER or any other party or the Shopping Center or the development relating to any Environmental Requirement or the existence of Hazardous Materials.

  20.4 If, at any time, it is determined that the Services violate any applicable Environmental Requirement or involve Hazardous Materials which require special handling in collection, storage, treatment or disposal, or any other form of cleanup or corrective action, CONTRACTOR shall within ten (10) days after receipt of notice thereof take, at its sole cost and expense, such actions as may be necessary to fully comply in all respects with all Environmental Requirements.

  20.5 If a lien is filed against any part of the Shopping Center resulting from the need to expend or the actual expending of monies arising from an Environmental Requirement, or a liability regarding Hazardous Materials related to an action or omission, whether intentional or unintentional, of CONTRACTOR or for which CONTRACTOR is responsible, then CONTRACTOR shall, within ten (10) days from the date that the CONTRACTOR is first given notice that such lien has been placed (or within such shorter period of time as may be specified by MANAGER or OWNER) either (a) immediately pay the claim and remove the lien, or (b) immediately furnish a cash deposit, bond, or such other security with respect thereto as is satisfactory in all respects to MANAGER or OWNER and is sufficient to effect a complete discharge of such lien on the Shopping Center.

  20.6 CONTRACTOR shall defend, indemnify, and hold harmless MANAGER or OWNER their affiliates, parent corporation, subsidiaries, partners, successors and assigns, and the employees, agents, officers, directors of any of them from and against any and all loss, claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, foreseen or unforeseen, contingent or otherwise (including, without limitation, counsel and consultant fees and expenses, investigation and laboratory fees and expenses, court costs, and litigation expenses) directly or indirectly arising out of, or in any way related to (i) any breach by CONTRACTOR of any of the provisions of this Paragraph 20; (ii) the presence, use, generation, transportation, disposal, spillage, discharge, emission, leakage, release, or threatened release of any Hazardous Material which is at, in, on, under, about, from or effecting the Shopping Center including, without limitation, any damage or injury resulting from any such Hazardous Material to or effecting the Shopping Center or any related soil, water, air, vegetation, buildings, personal property, persons or animals; (iii) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any such Hazardous Material; (iv) any lawsuit brought or threatened, settlement reached, or order or directive of or by any government agency or body relating to such Hazardous Material; or (v) any violation of any Environmental Requirement or any policy or requirement of MANAGER or OWNER hereunder. CONTRACTOR shall indemnify MANAGER or OWNER for all losses, including, but not limited to damages occasioned by the inability of MANAGER or OWNER to lease any area or a reduction in the fair market and/or rental value of any area of the Shopping Center due in whole or in part to Contractor's actions or omissions related to Hazardous Material or Environmental Requirements or the indemnity of Contractor set forth in this Section 20.6.

  20.7 CONTRACTOR acknowledges and agrees that in any dispute concerning any Hazardous Material or Environmental Requirement, it shall be presumed that any Hazardous Material or violation of an Environmental Requirement at, in, on or about the area at which the SERVICES are performed was caused by, and shall be the primary liability of, CONTRACTOR.

21. **JURY TRIAL WAIVER.** CONTRACTOR and MANAGER hereby waive their respective right to trial by jury of any cause of action, claim, counterclaim or cross-complaint in any action, proceeding and/or hearing brought by either MANAGER against CONTRACTOR or CONTRACTOR against MANAGER on any matter whatsoever arising out of, or in any way connected with, this AGREEMENT, the relationship of CONTRACTOR and MANAGER, MANAGER's Services rendered at the SHOPPING CENTER, or any claim or injury or damage, or the enforcement of any claim or injury or damage, or the enforcement of any remedy under any law, statute, or regulation, emergency or otherwise, now or hereafter in effect.

_____  _____
Contractor Initials       Mall Initials

5

22. **ASSIGNMENT.** CONTRACTOR recognizes that this AGREEMENT is a personal services contract and therefore agrees that CONTRACTOR shall not assign, convey or transfer this AGREEMENT nor any interest therein, whether by express assignment, conveyance or transfer, operation of law or otherwise. Any such attempted assignment, conveyance or transfer shall be null and void and of no force and effect whatsoever and CONTRACTOR shall remain fully liable for the performance of all terms, covenants and provisions of this AGREEMENT. CONTRACTOR hereby agrees that this AGREEMENT may be assigned by MANAGER or OWNER, at its sole option without obtaining further consent from CONTRACTOR, at any time and from time to time during the term of the AGREEMENT.

23. **SEVERABILITY.** If any provisions of this AGREEMENT shall to any extent be invalid or unenforceable, the remainder of this AGREEMENT shall not be affected thereby, and the unaffected provisions of this AGREEMENT, unless otherwise specifically conditioned upon such invalid or unenforceable provisions, shall be valid and enforceable to the fullest extent permitted by law.

24. **CROSS-DEFAULT.** The occasion of a default, or a breach, or an event which, with the passage of time or the giving of notice, would constitute a default in any of the terms or obligations of CONTRACTOR under any other Contractor's AGREEMENT for any other shopping center managed by MANAGER or owned by any of the OWNERS or OWNER'S affiliates, shall constitute an event of default hereunder whereupon OWNER or MANAGER may pursue such remedies as are available to it concurrently, cumulatively or successively against CONTRACTOR.

25. **MISCELLANEOUS.**

    25.1 All rights, options and remedies of MANAGER contained in this AGREEMENT shall be construed and held to be cumulative, and no one of them shall be exclusive of the other, and MANAGER shall have the right to pursue any one or all of such remedies or any other remedy or relief which may be provided by law, whether or not stated in this AGREEMENT. CONTRACTOR'S obligations hereunder shall survive the termination of this AGREEMENT.

    25.2 No waiver by MANAGER of a breach of any of the terms, covenants or conditions of this AGREEMENT by CONTRACTOR shall be construed or held to be a waiver of any succeeding or preceding breach of the same or any other term, covenant or condition herein contained. No waiver of any default of CONTRACTOR hereunder shall be implied from any omission by MANAGER to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than is specified in said waiver. The consent or approval by MANAGER to or of any act by CONTRACTOR requiring MANAGER'S consent or approval shall not be deemed to waive or render unnecessary MANAGER'S consent or approval to or of any subsequent similar act by CONTRACTOR. No payment by MANAGER to CONTRACTOR shall constitute a waiver of any remedies which MANAGER or OWNER may otherwise have against CONTRACTOR for any failure of CONTRACTOR to perform in accordance with this AGREEMENT.

    25.3 Time is of the essence in CONTRACTOR'S performance of this AGREEMENT.

    25.4 Any dispute or matter arising under this AGREEMENT shall be interpreted or construed, and adjudicated, under the laws of the state in which the Shopping Center is located.

    25.5 Any Notice intended for CONTRACTOR in this AGREEMENT shall be delivered to CONTRACTOR at the following address: 3608 Horizon Drive, King of Prussia, Pa. 19406. All notices permitted or required to be given by this AGREEMENT shall be in writing and shall be deemed given upon deposit in United States mail or with an overnight delivery service. CONTRACTOR represents that this is its current place of business and CONTRACTOR agrees to immediately notify MANAGER in writing of any change in said business address. CONTRACTOR shall maintain a telephone number which is answered during regular business hours and a number for any after-hours emergency and shall immediately notify MANAGER in writing of any changes.

    25.6 CONTRACTOR agrees that it will pay MANAGER'S reasonable attorneys' fees if MANAGER institutes any action or proceeding against CONTRACTOR arising out of or related to this AGREEMENT and prevails in such action. Such attorneys' fees shall include, but not be limited to, attorneys' fees, costs and disbursements as well as any such fees incurred by MANAGER on appeal from any such action or proceeding. Notwithstanding anything to the contrary contained herein, MANAGER may deduct such attorneys' fees from any amounts due to CONTRACTOR under this AGREEMENT or any other AGREEMENT between CONTRACTOR and MANAGER or its affiliates.

    25.7 CONTRACTOR shall give MANAGER a minimum of seven days prior written notice (from the date of delivery of such notice to the General Manager of SHOPPING CENTER) before commencing any lawsuit, claim or proceeding, whether at law or equity.

_____   _____
Contractor/Aiolo              Mall Initials

6

**Exhibit "A"**
Description of Services

**Scope of Work:** Mall

- All officers will maintain visibility in order to be a deterrent to crime
- All officers must have a working command of both spoken and written English in order to communicate clearly and professionally with patrons and fellow employees.
- All officers must be trained and have a working knowledge of the Center's fire/life safety system and be able to monitor and promptly respond to fire/life safety system alarm activations.
- All officers must be trained and have a working knowledge of the Center's gas and water main supply system and control valves.
- All officers must be trained in the administration of basic first aid, not including CPR.
- All officers must have a complete background check.
- All officers will courteously assist and direct patrons who require directions.
- All Officers must have a thorough knowledge of the Center's physical properties including, but not limited to: store names and locations, parking areas, public restrooms, electric rooms and roof hatches.
- All officers will work in partnership with Mall Management & staff.
- All officers will courteously advise/enforce Center policies with respect to patrons and employees.
- All officers will assist in reuniting parents and lost children
- If applicable, dispatcher will courteously and professionally field telephone calls, monitor radio communications, log incidents and time response, monitor security cameras, monitor fire/life safety system alarms.
- All officers will document, in the form of a written incident report, including photographs (using the Contractor's equipment and Contractor's film — including developing, if necessary), all accidents and injuries on Center property.
- All officers will document, in the form of a written facilities report, including photographs (using Contractor's equipment and Contractor's film — including developing, if necessary) damage to or defects of the Center's property and equipment. Conditions that pose immediate danger and safety risks are to be brought to the attention of Center Management immediately, and precautionary measures taken.
- All officers will log in and store for safekeeping lost and found items so that they may be returned to their proper owners.
- Officers are prohibited from knowingly speaking to identified representatives of news media. All media questions are to be directed to Management.
- Officers are prohibited from entering Tenant premises, except for the case of a Supervisor in charge responding to tenant's call or in the event of an emergency.
- Officers are prohibited from socializing, flirting or dating patrons, Mall employees or other officers while on Center property and in uniform.
- Officers are prohibited from making arrests related to Tenant matters such as shoplifting, stolen credit cards, bad checks, etc.
- Officers must be trained (with Manager's assistance) in the techniques of orderly evacuation of the Center in emergencies such as fire, earthquake, bomb threats, etc.
- Officers are to attempt to calm persons trapped in elevators and assist Manager, service personnel and/or the local Fire Department in responding.
- All officers will distribute Center Management memoranda to individual tenants and post and serve notices as directed by Center Management.
- Officers will notify housekeeping personnel of any observed wet and dry spills. Dry spills that can easily be addressed should be handled immediately by officer. Officers will stand by any spill until it has been properly taken care of.
- Officers will patrol service corridors and stairwells.
- Officers will perform nightly fire riser inspections and monthly fire extinguisher checks.
- Officers will provide fire watch when required.
- Officers will monitor restrooms on a scheduled basis and notify housekeeping or engineering of any items needing attention.
- Contractor will provide additional staffing of officers for special events where crowd control may be required. If the special event is not normally scheduled at the Center, it shall be billed as additional to the contract.
- Contractor will report and record crime statistics.
- Contractor will provide additional personnel commensurate with peak business season from November 15 through January 2 without additional charges to the contract.
- The Contractor's Director will coordinate efforts with off duty police and mounted patrol.

_____
Contractor Initials

_____
Mall Initials

7

**EXHIBIT A: PAGE 2**

**Scope of Work:**   Exterior

- All officers will maintain visibility to be a deterrent to crime.
- All officers will document, in the form of a written facilities report (including photographs, if necessary), damage to or defects of Center property and equipment as and when requested by Manager. Conditions that pose immediate danger and/or safety/security risks are to be reported immediately to Center Manager and precautionary measures taken.
- All officers will document, in the form of a written incident report (including photographs, if necessary), accidents and injuries on Center property.
- All officers will enforce employee parking policy.
- All officers will assist patrons in locating lost vehicles.
- Officers will report daily traffic counts.
- Officers will courteously assist and direct patrons who require directions.
- Officers will use their best efforts, based on available staffing, to escort patrons and employees from the mall to their vehicles when requested.
- Officers will patrol parking lots, service corridors and loading docks to facilitate the free flow of traffic.
- Officers will patrol property perimeter.
- Officers will log vehicles parked overnight.
- Offices will assist on vehicle lockouts and jumpstarts.
- Contractor will provide additional staffing of officers for special events where crowd control may be required. If the special event is not normally scheduled at the Center, it will be an additional charge to the contract.
- Contractor will provide additional personnel commensurate with the peak business season from November 15 through January 2. This will not be an additional charge to the contract.

**EQUIPMENT**

- Contractor will provide radios for its personnel's use. All maintenance and repairs for the radios are the responsibility of Contractor.
- Contractor to provide all bikes, golf carts, vehicles to provide proper patrol.
- Contractor to provide all uniforms and other equipment to run security patrol.

**INSURANCE REQUIREMENTS**

The following must appear as Additional Insureds and Additional Named Insureds on the Certificate of Insurance:

Westfield America, Inc., Westland Properties, Inc., Westfield Corporation, Inc. and any and all of their respective partners, subsidiaries and affiliates, together with any mortgagee from time to time of the Landlord's interest, are named as an additional insured, as their interests may appear.

_____   _____
Contractor Initials                Mall Initials

8

## EXHIBIT "B"

**Police Extra Duty Contracts**

- Extra duty police scheduling and costs will be the responsibility of SpectaGuard.
- All extra duty police scheduling will be approved solely by Westfield Management.
- Westfield Management will promptly reimburse directly to SpectaGuard the approved cost of police services. There will be no additional charge or fee added to the police departments invoice.

Westfield Management

_____
Gary Karl

SpectaGuard

_____

9