83

1     Q.   Fair enough. And you
2 testified in response to Mr. Brown and I
3 think Mr. Flanagan's questions that it was
4 outside the mall that you were told that
5 you and members of your group violated two
6 rules of the mall?
7     A.   Yes, sir.
8     Q.   And why was it that you went
9 into the photography store, you took
10 pictures in there?
11     A.   No, I wanted to.
12     Q.   You wanted to have your
13 picture taken?
14     A.   Yes.
15     Q.   When did you decide to do
16 that?
17     A.   When I was going in, when I
18 saw the store.
19     Q.   So this was after the
20 security guards had already asked you to
21 leave you decided that you were going to
22 have your picture taken?
23     A.   I wanted to get my picture
24 way before the incident took place.
25     Q.   If I understand the testimony

84

1   correctly, the photograph store is
2   downstairs, correct?
3       A.  Yes. But we have to --
4   somehow we had to pass the photograph store
5   to go upstairs.
6       Q.  But you went to the
7   photography store after coming downstairs,
8   correct?
9       A.  Yes.
10      Q.  After being in Lord & Taylor?
11      A.  Yes.
12      Q.  And it was upstairs that the
13  security asked you to leave the mall?
14      A.  Right.
15      Q.  So it was after security
16  asked you to leave the mall and you wanted
17  to -- decided to have your pictures taken,
18  correct?
19      A.  Yes.
20      Q.  You testified that while
21  standing outside Lord & Taylor after you
22  exited, the security guard said, quote, get
23  the fuck out, end quote. Is that correct?
24      A.  I heard somebody said, don't
25  ask me who, I can't identify who said it

85

```
 1    but somebody did.
 2              Q.    You overheard the security
 3    guard say that?
 4              A.    Yes.
 5              Q.    Did he say that just to the
 6    people that were sitting there silently?
 7              A.    Like I said.  The only person
 8    I could remember was acting out was the
 9    only person that can't be here to testify.
10              Q.    And that's?
11              A.    Omar Bunton.
12              Q.    Omar or Marvin?
13              A.    Marvin Omar Bunton.
14              Q.    So he was acting up?
15              A.    Yeah.
16              Q.    And it was after he was
17    acting up that the security guard said get
18    the fuck out?
19              A.    No, no, no, no.  You probably
20    mis --
21              Q.    What I want to know, sir --
22              A.    By me coming out there and
23    the security guard telling them they got to
24    leave, while he's acting out, he want to
25    know why he got to leave, why I'm supposed
```

86

1   to leave?  Give me a reason why I got to
2   leave, I'll leave.  No problem.  There was
3   no explanation.  Wouldn't you act out?
4           Q.    No, sir, I wouldn't.
5           A.    No?  Come on, man.
6           Q.    So it's your testimony -- is
7   it your testimony that you and your group
8   were just sitting there and this officer
9   said get the fuck out?
10          A.    I wasn't sitting, I was
11  standing up.
12          Q.    You were just standing there?
13          A.    Yes.
14          Q.    Minding your own business?
15          A.    I wasn't minding my business,
16  I was minding their business because I was
17  part of their business.  We all came
18  together.  How you going to kick them out?
19  I want to know why.
20          Q.    I believe you said and I'm
21  not sure I understood your testimony
22  correctly, did you say you filed a
23  complaint in this action and you thought it
24  would be forgotten about?
25          A.    Its been so long, I thought

103

1    Q.   That's what the security
2 guard said, correct?
3    A.   Yes.
4    Q.   Somebody in your group was
5 being loud, correct?
6    A.   Hey, I wasn't there, so I
7 can't say so.
8    Q.   Well, you saw Mr. Bunton
9 become argumentative, correct?
10   A.   Yes, I did say that.
11   Q.   You heard him say that I
12 ain't doing shit, correct?
13   A.   I did not hear that but you
14 know, he was being, you know, he was upset.
15   Q.   With the security guard?
16   A.   Yes.
17   Q.   He was giving the security
18 guard a hard time?
19   A.   Yes.
20   Q.   Now, in this lawsuit, you
21 claim that people from Westfield conspired,
22 had a plan with the security guards or the
23 Town of Trumbull to discriminate against
24 you.  Are you aware of that claim?
25   A.   No.

**NIZIANKIEWICZ & MILLER REPORTING SERVICES**
*972 Tolland Street*
*East Hartford, Connecticut  06108*
*(860) 291-9191     FAX:  (860) 528-1972*

104

```
 1         Q.    Do you know of any facts to
 2   support that claim?
 3         A.    They hired the security
 4   guards.
 5         Q.    Did they hire the security
 6   guards to discriminate against you?
 7         A.    No.  They hired the security
 8   guard who discriminated against us.
 9         Q.    Do you know of any plan by
10   the mall employees and the security company
11   to discriminate against you?
12         A.    No.  I didn't see or heard
13   any plans.
14         Q.    And no one from Westfield
15   detained you, correct?
16         A.    From Trumbull Police
17   Department.
18         Q.    I understand you claim that
19   somebody from the Trumbull Police
20   Department detained you but my question is
21   no one from Westfield detained you,
22   correct?
23         A.    No.  They was just stalking
24   me and embarrassing me, walking me through
25   the hallway.
```

105

1      Q.   No one from Westfield was
2 there?
3      A.   What you call the security
4 guard, wasn't it an employee of Westfield?
5      Q.   No, sir, they weren't but.
6 Do you know of anyone from Westfield that
7 was present on that date?
8      A.   The security guards.
9      Q.   That's it?
10     A.   As far as I was concerned
11 they was employed by whoever owned the
12 mall.
13     Q.   And they did not detain you,
14 correct?
15     A.   No, they did not detain us.
16     Q.   And similar to your other
17 friends, you retained an attorney to
18 represent you in this case within a day or
19 so after the incident?
20     A.   We all went down there.  We
21 all went.  We drove down, we all sat down
22 and talked about it and we said to prevent
23 this from happening to somebody else, we
24 should go public and seek an attorney and
25 we did it.

110

1    A.    Yes.

2    Q.    Did Ms. Clark ever shout to a
3  security guard or anyone, quote, man, don't
4  give me that shit?

5    A.    I don't remember it. I don't
6  remember.

7    Q.    You don't remember that?

8    A.    No.

9    Q.    Did you observe other male
10 members of your group other than Mr.
11 Bunton, excuse me, shouting or arguing with
12 security guards?

13    A.    No, because Kenneth was
14 sitting down --

15        MS. HARDAWAY: I object to
16    the form of the question. I don't
17    think he characterized Omar as
18    shouting -- you said shouting at.

19        MR. MCCORMACK: Or
20    arguing.

21    Q.    (By Mr. McCormack) Omar was
22 arguing with a security guard, correct?

23    A.    I wouldn't say arguing but he
24 wasn't cooperating.

25    Q.    Were there any other members

111

1  of your group that were not cooperating
2  with the security guards?
3       A.   I mean, you know what I'm
4  saying, after we asked the question why we
5  had to leave the mall and they couldn't
6  stated any reason, nobody wanted to -- we
7  wasn't paying them no attention.  We just
8  figure, all right, leave upstairs, maybe
9  they'll stop, you know.
10      Q.   So of that moment any one of
11 you didn't cooperate with the security
12 guards?
13      A.   Well, in the end we actually
14 did because they followed us everywhere.
15 We went, like I said, I went downstairs
16 into the photo store, they was in there
17 with me, some was over there with the rest
18 of the guys that was in the store.  I got
19 embarrassed because everybody was looking
20 at us so I left.
21      Q.   I'm referring upstairs when
22 you asked what the issue was.  At that
23 point, no one cooperated with the security
24 guards, correct?
25      A.   We were being -- we was

```
 1        A.   Yes, because that's an
 2   assault.
 3        Q.   What if the police were told
 4   that there is a group of shoppers that was
 5   harassing other patrons of the mall.  If
 6   the police were told that, would it be
 7   reasonable for the police to respond to the
 8   mall?
 9        A.   Of course because if I file a
10   complaint like that, I would want the cops
11   to show up.
12        Q.   Okay.  Did there come a
13   point when your group decided on its own to
14   leave the mall?
15        A.   Yeah.  After we went in the
16   photograph store and everybody came out, I
17   was like Yo, let's go.
18        Q.   So is it fair that the police
19   did not force you to leave?
20        A.   Like I said, the cops was
21   outside --
22             MS. HARDAWAY:  Object to the
23        form.
24             MR. BROWN:  You can
25        answer.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191     FAX:  (860) 528-1972

```
                                                             139
 1                  MS. HARDAWAY:   No
 2      questions.
 3
 4      (Deposition concluded at 6:15 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                            140
 1    UNITED STATES DISTRICT COURT )
                                   )SS.
 2    DISTRICT OF CONNECTICUT      )

 3            I, Okeemah S. Henderson, LSR and a
 4    Notary Public for the State of Connecticut,
 5    do hereby certify that the deposition of
 6    RICHARD MYERS, was taken before me pursuant
 7    to Rule 30 of the Federal Rules of Civil
 8    Procedure at Hassett & George, P.C., 555
 9    Franklin Avenue, Hartford, CT commencing at
10    3:56 p.m. on April 22, 2004.
11            I further certify that the
12    above-named deponent was first duly sworn
13    by me to tell the truth, and was examined
14    by counsel, and his testimony was
15    stenographically reported by me and
16    subsequently transcribed as hereinbefore
17    appears.
18            I further certify that I am not
19    related to the parties hereto or their
20    counsel, and that I am not in any way
21    interested in the outcome of said case.
22            Dated at Agawam, Massachusetts,
23    this 14th day of May, 2004.

24                 Okeemah S. Henderson, LSR No. 0033
                   Notary Public
25    My commission expires April 30, 2007.
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191     FAX: (860) 528-1972