68

1   when we went downstairs. I think there was
2   a food court downstairs also, if I'm not
3   mistaken.
4        Q.    Did you pass through the food
5   court?
6        A.    No, I don't think we did. I
7   think we beared to the left, I'm thinking
8   that we did.
9        Q.    And is it your testimony for
10  that entire half an hour essentially you
11  and the group you were with were followed
12  by six or so security guards?
13       A.    Yes.
14       Q.    At any time, did any of the
15  security guards use any physical force to
16  cause you and your group to leave the mall?
17       A.    Physical force? No.
18       Q.    Did they ask you to leave the
19  mall?
20       A.    Yes.
21       Q.    Did they record your
22  testimony to instruct you to leave the
23  mall?
24       A.    No.
25       Q.    Did they give you any reason

82

1  A. I haven't seen or heard
2  anything from him, so I'm not quite sure.
3  Q. Did the security guards at
4  any time use any racial slurs?
5  A. No.
6  Q. Did the security guards at
7  any time use any slurs with reference to
8  your perceived national origin?
9  A. No.
10  Q. Did any of the security
11  guards ever curse at you?
12  A. Well, they didn't curse at me
13  but one security guard, he was using
14  profanity.
15  Q. Who was it directed at if you
16  remember?
17  A. Well, he was dealing with us
18  so I would assume that he's talking to us.
19  Q. When you say us, who's us?
20  A. The entire group.
21  Q. Do you remember what security
22  guard it was?
23  A. The one person that was
24  saying a whole bunch of stuff is the
25  Hispanic guy and like I said before, he was

112

1   was in Lord & Taylor went over there trying
2   to find out what was going on and they were
3   saying that we had to leave the mall.
4        Q.   So when you came out of Lord
5   & Taylor and came out, the security told
6   you to leave the mall, correct?
7        A.   Yes.
8        Q.   And you disregarded them,
9   correct?
10       A.   Yes. I walked away. Yes, I
11   did.
12       Q.   You disobeyed them?
13       A.   I dis -- I walked away
14   because I didn't see the reason I had to
15   leave, so I walked away.
16       Q.   So you didn't leave?
17       A.   When they followed us, that's
18   when we left.
19       Q.   And in the portrait store,
20   they asked you to leave then?
21       A.   Yes. Because at first, they
22   didn't know we were together, they thought
23   we were just trying to find out what's
24   going on with these guys, that's when we
25   went over to the store. He asked if we

115

1   was there anyone outside of Lord & Taylor
2   when you exited Lord & Taylor?
3           A.   No.
4           Q.   Did you ever have any
5   encounter with any manager of the mall?
6           A.   Any managers?  No.
7           Q.   Did you have any encounter
8   with anyone that identified themselves as
9   someone from Westfield Shopping Town
10  Trumbull?
11          A.   Not to my knowledge.
12          Q.   Is it fair that the only
13  people you dealt with on the night of July
14  31st 2001 were the security officers and
15  the police officers from the Town of
16  Trumbull?
17          A.   Yes.
18          Q.   And police officers from the
19  Town of Trumbull were outside the mall?
20          A.   Yes.
21          Q.   Did all six or seven security
22  officers go outside with you?
23          A.   Yes.  They escorted us out
24  the door.
25          Q.   Did they go back inside after

1  that?

2  A. I think they did. I think

3  they did. I don't remember. I think a few

4  were still standing there while the cops

5  were there with us.

6  Q. Now, in your complaint you

7  allege that people from Westfield Shopping

8  Town Trumbull conspired with the Town of

9  Trumbull or the security officers to

10 discriminate against you. Can you tell me

11 what facts you base that claim on?

12 A. What facts I base that claim

13 on was the fact that we were black and they

14 just wanted us to leave.

15 Q. But no one from the mall was

16 there, correct?

17 A. No one from the mall.

18 Q. Other than security?

19 A. Other than security guards.

20 No.

21 Q. So what facts are you relying

22 upon to support an allegation that someone

23 from the mall planned to discriminate

24 against you?

25 A. I wouldn't say they planned

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191     FAX: (860) 528-1972

117

1  it. I wouldn't say it was planned.
2          Q. Did you have any indication
3  on that date that it was planned?
4          A. No, I wouldn't say, okay, we
5  planned to attack black people who come in
6  here. I wouldn't say its something they
7  planned.
8          Q. Would you -- you would agree
9  that you don't think anyone planned to
10 discriminate against you?
11         A. You never know sometime.
12         Q. Would you agree with that
13 statement?
14         A. Yes.
15         Q. And it's also fair to say
16 that no one from Westfield Shopping Town
17 Trumbull detained you, correct?
18         A. Well, apart from the police
19 just having us there telling us we can't
20 move, we can't leave, you know, because you
21 remember that the cop had escorted I think
22 it was Mr. Bingham to the car for his
23 wallet because he left his wallet in the
24 car and two of the cops walked with him to
25 the car for his wallet.

118

1   Q.  It was the Town of Trumbull
2   police?
3   A.  Yes.
4   Q.  But other than those
5   individuals, no one else detained you?
6   A.  No.
7   Q.  Did you have anything to eat
8   in the mall?
9   A.  No.
10  Q.  Did you ever throw a piece of
11  pretzel at anyone?
12  A.  No.
13  Q.  Would you say that anyone in
14  your group gave the security guards a hard
15  time that evening?
16  A.  No, I wouldn't say that.
17  Q.  You wouldn't agree with that?
18  A.  No, because if we were giving
19  them a hard time, then I guess we would
20  have stayed in the mall if we were giving
21  them a hard time but we complied with what
22  they said and we left.
23  Q.  If you were arguing with
24  them, would you consider that a hard time?
25  A.  We weren't arguing with them.

128

1  A. I don't know if they were told, I
2  don't know what they were told but they were
3  there for some reason.
4  Q. Let's assume for the sake of
5  argument that the police officers were told
6  about these complaints before they arrived
7  at the mall. If the police officers had
8  been told of these complaints before they
9  arrived at the mall, would the police
10 officers' actions that evening have been
11 appropriate?
12 A. Somewhat.
13    MR. BROWN: Okay. Thank you.
14 I have no further questions,
15 ma'am.
16
17 (Deposition concluded at 1:26 p.m.)

129

```
 1   UNITED STATES DISTRICT COURT )
                                  )SS.
 2   DISTRICT OF CONNECTICUT      )

 3          I, Okeemah S. Henderson, LSR and a
 4   Notary Public for the State of Connecticut,
 5   do hereby certify that the deposition of
 6   SHERNETTE CLARK, was taken before me
 7   pursuant to Rule 30 of the Federal Rules of
 8   Civil Procedure at Hassett & George, P.C.,
 9   555 Franklin Avenue, Hartford, CT commencing
10   at 11:18 a.m. on April 22, 2004.
11          I further certify that the
12   above-named deponent was first duly sworn by
13   me to tell the truth, and was examined by
14   counsel, and her testimony was
15   stenographically reported by me and
16   subsequently transcribed as hereinbefore
17   appears.
18          I further certify that I am not
19   related to the parties hereto or their
20   counsel, and that I am not in any way
21   interested in the outcome of said case.
22          Dated at Agawam, Massachusetts,
23   this 14th day of May, 2004.
24                     _____
                       Okeemah S. Henderson, LSR No. 00333
25                     Notary Public
     My commission expires April 30, 2007.
```

**NIZIANKIEWICZ & MILLER REPORTING SERVICES**
972 Tolland Street
East Hartford, Connecticut 06108
(860) 291-9191        FAX: (860) 528-1972