83

1   the words?  If you heard profanities, what
2   are the words?  Specifically what did you
3   hear?
4           MR. FLANAGAN:  Objection to
5       form.  You're asking him two
6       different questions.  I'm not sure
7       what you're talking about, when he
8       hit the top of the escalator or
9       when he approached --
10          MS. HARDAWAY:  He knows
11      what I'm talking about, the top of
12      the escalator.
13          Q.   (By Ms. Hardaway) You said
14  you heard loud words, correct?
15          A.   Yes.
16          Q.   What word did you hear?
17          A.   Shit.  Leave me alone.  We
18  ain't doing anything.  And as I progressed,
19  I didn't stand there, so as I progressed,
20  you hear more words as you get closer and
21  at that point --
22          Q.   I'm back to the top of the
23  escalator.
24          A.   I didn't stand still at the
25  top of the escalator.

1      Q.   I understand that but you
2  testified that you reached the top of the
3  escalator and you heard loud language,
4  correct?
5      A.   Correct.
6      Q.   And my question to you was
7  what was the language that you heard?
8           MR. FLANAGAN:  Objection.
9  Asked and answered.
10          MR. MCCORMACK:  Objection.
11  He just told you, Counselor.
12          MS. HARDAWAY:  Is that
13  your --
14          MR. MCCORMACK:  Objection
15  to the form and asked and answered.
16          THE WITNESS:  I know I
17  heard shit.  I probably heard the
18  word fuck.  I don't know if it was
19  at the top of the escalator that I
20  heard both words or as I moved down
21  the hallway.  Again, when I heard
22  the conversation at the top of the
23  escalator, I didn't stop to say
24  what can I hear.
25          Q.   (By Ms. Hardaway) I

85

1    understand that but I'm going by your
2    testimony. You said you heard language. I
3    merely asked you what language you heard?
4              MR. FLANAGAN: Objection to
5    form.
6         Q.   (By Ms. Hardaway) Is your
7    testimony that you heard the word shit?
8         A.   Yes.
9         Q.   And your testimony is that
10   you probably heard the word fuck?
11        A.   Yes.
12        Q.   At that point, do you know
13   who was saying those words?
14        A.   It was -- I know it was not
15   Fernando Torres.
16        Q.   How do you know that?
17        A.   Because I have worked with
18   him for a number of years and I know his
19   voice.
20        Q.   Okay. And you know his voice
21   from the word shit?
22        A.   Yes.
23             MR. FLANAGAN: Objection to
24   form.
25             MR. MCCORMACK: Objection

1    A.    Correct.
2    Q.    And then what happened as you
3 approached?
4    MR. MCCORMACK:    I'm just
5    going to object, for the record.
6    You said they were in a group, you
7    represented to him that they were
8    in the group.
9    Q.    (By Ms. Hardaway) When you
10 approached the group, what happened?
11    A.    As we approached the group,
12 it was a determined -- a determination was
13 made based on the code of conduct that they
14 were using loud language, loud, profane
15 language, they were in a group of three or
16 more and did not want to comply with the
17 mall regulations of to continue moving
18 after being asked to leave or asked to move
19 along, that it was determined that we were
20 going to ask them to leave the mall
21 completely.
22    Q.    Okay.  Now, you weren't the
23 first officer to approach the group, were
24 you?
25    A.    I was not first the officer,

1  no.
2          Q.      When was that determination
3  made that they, that you had to ask them to
4  leave the mall?
5          A.      I made the determination
6  myself and it may have been made prior to
7  myself when I got to the top of the food
8  court escalator and heard those words that
9  they were going to have to leave the mall.
10         Q.      So when you got to the top of
11 the mall and you heard the word shit and
12 you heard the word fuck with nothing more,
13 you decided that these people have to leave
14 this mall?
15                 MR. FLANAGAN: Objection to
16      form.
17                 MR. MCCORMACK: Objection
18      to form.
19                 MR. BROWN:  Objection to
20      form.
21                 THE WITNESS:  That we were
22      going to ask them to leave.  Yes.
23         Q.      (By Ms. Hardaway) Before you
24 said had to leave, now you were going to
25 ask them to leave?

108

1  Q.  So when you continued to walk
2  with them, it was for the purpose to make
3  sure they got to the exit?
4  A.  Correct.
5  Q.  So you weren't going to just
6  leave them to go find the exit on their
7  own?
8  A.  Correct.
9  Q.  And then what happened?
10 A.  From them stopping or from.
11 Q.  From the -- you said there
12 was a break up?
13 A.  Yes.  In this hallway here
14 you can break into two separate groups and
15 they didn't stay all together, they broke
16 into two separate groups as they proceeded
17 to stop along the way specifically in front
18 of the entrance here, the FYE where we
19 thought they were going out entrance two
20 and I agree at that point is when I radioed
21 for our dispatch office to contact Trumbull
22 Police who had already been notified by
23 Sergeant Torres earlier to direct them to
24 the entrance two area because that's the
25 area that we were closely at at that point

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191    FAX: (860) 528-1972

1    where they stopped.
2        Q.   You said you contacted,
3    Officer Torres contacted the Trumbull
4    Police Department to meet you guys at
5    Door 2?
6        MR. FLANAGAN:  Objection to
7      form.
8        MR. MCCORMACK:  Objection
9      to form.
10       MR. BROWN:  Objection to
11      form.
12       Q.   (By Ms. Hardaway) Is that
13    what you --
14       A.   No.  I believe Sergeant
15    Torres earlier had requested when he made
16    the initial call for assistance is when I
17    was going up there.  I believe that that
18    was actually a call for the police
19    department at the same time.
20       Q.   Let me stop you.  Back when
21    you were first going up to the escalators
22    to join Officer Torres, he called the
23    police at that point?
24       A.   I can't recall but I -- it
25    was either at that point or when we were

1   heading back towards the door.
2           Q.   What door?
3           A.   Door 4 on the upper level
4   when we started walking.
5           Q.   The group?
6           A.   The group. Yes.
7           Q.   Go ahead.
8           A.   We were walking down towards
9   entrance two and we stopped outside of FYE
10  doors and at that point, no one was moving
11  so still arguing with us, we don't have to
12  leave, this is a public place, we can do
13  what we want, we're not doing anything
14  wrong. Again, still trying to say this is
15  why we're asking you to leave, these are
16  the rules of the mall. I'm sorry that you
17  have to leave. I radioed for our dispatch
18  to contact the police department to the
19  arrive at Door 2 because that's where we
20  were.
21          As soon as I radioed that into our
22  dispatcher, we then proceeded around what
23  we call your JC Penny court again, down the
24  hallway here (indicating) and we broke into
25  two separate groups, one group went on the

1   inner side of the mall, the other group
2   went around what was the fountain there and
3   the outside.
4           Q.   Is there any reason why you
5   didn't, they didn't go out of Door 2?
6           A.   Not to my knowledge.  In
7   hindsight it's because they parked over at
8   Door 1.
9           Q.   Well, you think that's why.
10          A.   Well, their cars were there.
11          Q.   So you think that's why they
12  didn't go out of Door 2?
13          A.   Yes.
14          Q.   Now, you continued to follow
15  them throughout the mall?
16          A.   We continued to walk with
17  them.  Yes.  I was speaking with the
18  gentleman trying to explain what was still
19  happening, it was a conversation that we
20  had all the way through the mall.
21          Q.   So you all were walking along
22  together?
23          A.   And there were two groups.  I
24  believe some of the officers may have been
25  following, Officer Pagan may have been

112

1   following Sergeant Torres and myself who at
2   that point because of our supervisory
3   positions somewhat took the escort
4   ourselves.
5        Q.   Was there ever a time during
6   this period that you're talking about that
7   other security officers came?
8        A.   I believe when we were at
9   entrance one when we finally got around to
10  the side of the mall where they were
11  starting to leave finally, that another
12  officer may have come in.
13       Q.   So one other officer?
14       A.   Yes.
15       Q.   So during the entire
16  incident, there were four officers?
17       A.   Four officers.
18       Q.   So what happened when you got
19  around the corner there?
20       A.   When we got around the mall,
21  they then proceeded out this door and at
22  that point, Trumbull Police Department were
23  there waiting and that's when I went over,
24  myself and Sergeant Torres and spoke to the
25  police officers.

135

1           THE WITNESS: Okay. Thank
2  you.
3                CROSS EXAMINATION
4  BY MR. MCCORMACK:
5       Q.    Good afternoon Mr. Hokanson.
6  I introduced myself before, my name is Mike
7  McCormack and I represent the named
8  defendant Westfield Shopping Town Trumbull.
9  I do have some follow up questions for you.
10 Turning your attention to the security
11 report which was marked as Plaintiff's
12 Exhibit 1, Mr. Torres prepared this report?
13      A.    Correct.
14      Q.    And was it the normal
15 practice of employees of Spectaguard to
16 prepare such a report after incidents?
17      A.    Yes.
18      Q.    Did you prepare a report
19 after every incident?
20      A.    Yes.
21      Q.    And who maintains these
22 reports?
23      A.    Westfield, I believe,
24 maintains them.
25      Q.    Does Spectaguard maintain

136

```
 1        a copy also?
 2             A.    I'm not sure.
 3             Q.    And so it was Mr. Torres's
 4        duty to prepare this report?
 5             A.    Yes.
 6             Q.    And it indicates that the
 7        report was prepared on July 31, 2001?
 8             A.    Yes, it does.
 9             Q.    It indicates the report was
10        prepared at 23:00?
11             A.    Yes.
12             Q.    Do you know what time that
13        is?
14             A.    11 o'clock.
15             Q.    In the morning?
16             A.    No, at night.
17             Q.    To your knowledge, was this
18        report prepared at 11 p.m.?
19             A.    Yes.
20             Q.    And it indicates that the
21        occurrence for which the report was
22        prepared took place on July 31, 2001?
23             A.    Correct.  Yes.
24             Q.    And it gives the time of
25        occurrence, correct?
```

137

1       A.   Yes.
2       Q.   And what time is the
3  occurrence on the report?
4       A.   21:12.  9:12.
5       Q.   9:12 p.m.?
6       A.   Yes.
7       Q.   What day of the week did the
8  incident occur, sir?
9       A.   According to the report, on
10 Tuesday.
11      Q.   Do you recall on Tuesday,
12 July 31, 2001 what time the mall closed?
13      A.   Yes.  9:30.
14      Q.   Was that a normal weekday
15 closing time?
16      A.   Yes.
17      Q.   So do I understand it to be
18 then that the plaintiffs would have been
19 required to leave the premises no later
20 than 9:30 p.m. regardless of whether an
21 incident occurred or not?
22      A.   That's correct.
23      Q.   You and Mr. Torres received a
24 call for assistance at 9:12 p.m.?
25      A.   A general dispatch came out