138

1    approximately that time for a report of a
2    disturbance.
3         Q.   Okay. On the report, it
4    indicates time call received 21:12?
5         A.   Yes.
6         Q.   Is that the time that
7    dispatch broadcast the call?
8         A.   I would -- yes.
9         Q.   To your knowledge?
10        A.   To my knowledge.
11        Q.   And that's 9:12 p.m.?
12        A.   Yes.
13        Q.   It also indicates the time SO
14   arrives on scene. What is that?
15        A.   The time security officer
16   arrive on scene, it's virtually the same
17   time.
18        Q.   21:12?
19        A.   Yes. 9:12 p.m.
20        Q.   And this report indicates the
21   location of the incident; is that correct?
22        A.   That's correct.
23        Q.   And where was the location of
24   the incident?
25        A.   It's indicated at Game Stop

*NIZIANKIEWICZ & MILLER REPORTING SERVICES*
*972 Tolland Street*
*East Hartford, Connecticut  06108*
*(860) 291-9191     FAX: (860) 528-1972*

1   slash Door 1.
2           Q.    And is that in the general
3   area of the area you described for us
4   before referring to Plaintiff's Exhibit 3-A
5   I believe it was?
6           A.    3-A and B.  Yes.  We started
7   up at Game Stop which is located in the
8   Lord & Taylor court, we progressed over
9   towards Door 4 still on the upper level,
10  went down the escalator through the food
11  court past another exit door, Door 2,
12  around JC Penny court and exit finally
13  outside of Door 1 which is on the lower
14  level.
15          Q.    And turning to Page 2 of this
16  report, it indicates the very last sentence
17  that all parties were clear from the
18  property at 21:41.  Do you see that?
19          A.    Yes.
20          Q.    Do you know what time that
21  is, sir?
22          A.    Yes.  9:41 p.m.
23          Q.    So do I understand from this
24  report that the entire incident took place
25  over the course of 30 minutes?

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191      FAX:  (860) 528-1972

1     A.    Correct.
2     Q.    And everyone had left the
3  mall premises within 11 minutes after the
4  closing time?
5     A.    Yes.
6     Q.    On Page 1 it indicates seven
7  individuals in the section entitled
8  suspects.  Do you see that?
9     A.    Correct.   Yes.
10    Q.    No one's name is identified
11 there; is that correct?
12    A.    That's correct.
13    Q.    Did you ever obtain the name
14 of these individuals?
15    A.    We did not, no.
16    Q.    Did you ever ask for that?
17    A.    No, we did not.
18    Q.    Did the color of the
19 individual's skin play any role in your
20 decision to ask them to leave the mall?
21    A.    No.
22    Q.    Why did you ask them to leave
23 the mall?
24    A.    For the disorderly conduct
25 being of profane language, the store

141

```
 1   complaints that we received prior to the
 2   incident.
 3           Q.   And if I understand your
 4   testimony to be it was the profanities and
 5   loud conduct towards the security officers;
 6   is that correct?
 7           A.   I can't say toward the
 8   security officers, no.  I don't know if any
 9   of it was directly at them.  No.
10           Q.   But in the presence of
11   security officers?
12           A.   In the presence of them.
13   Yes.
14           Q.   You indicated that you heard,
15   when you first arrived upstairs, you heard
16   the word fuck; is that correct?
17           A.   Yes.
18           Q.   And heard the word shit?
19           A.   Yes.
20           Q.   Did you ever hear someone say
21   I ain't doin' shit?
22           A.   At some point I did hear, I'm
23   not doin' nothin' or something to that
24   effect, those exact words I don't
25   necessarily recall.  No.
```

142

1   Q.   And there was one female in
2   the group; is that correct?
3   A.   To my knowledge.  Yes.
4   Q.   Now, on July 31, 2001, there
5   was a contract in existence between
6   Westfield Corporation and Spectaguard
7   Acquisition; is that correct?
8   A.   Not to my -- not to my
9   general knowledge but I did work for a
10  security company who I believe was
11  contracted by Westfield.
12  Q.   On June 31, 2001, was the
13  security company that you worked for
14  Spectaguard or Allied?
15  A.   It was Spectaguard -- I
16  believe it was still Spectaguard.
17  Q.   At some point in time, it
18  became Allied?
19  A.   Yes, through some sort of
20  merge.
21  Q.   Mergers and acquisitions and
22  all that good stuff?
23  A.   We're Allied Security, a
24  Spectaguard Company, so it's virtually the
25  same company.

143

1     Q.    Do you know when that took
2 place?
3     A.    No, not off the top of my
4 head.
5     Q.    You were an employee of the
6 security company, correct?
7     A.    Yes.
8     Q.    Was Mr. Torres an employee of
9 the security company?
10     A.    Yes.
11     Q.    How about Mr. Pagan?
12     A.    Yes.
13     Q.    Was there anyone from
14 Westfield present on July 31, 2001 that was
15 directing how to handle this situation?
16     A.    At that time, no.
17     Q.    Did you have any interaction
18 with anybody from Westfield at any time
19 between 9:12 p.m. and 9:41 p.m. on July 31,
20 2001?
21     A.    No.
22     Q.    Did you have any interaction
23 with anyone from Westfield at any time
24 after the incident?
25     A.    Can you narrow that down?

146

1 involved in the incident?
2     A.    No.
3     Q.    You asked them to leave?
4     A.    Yes.
5     Q.    So to your knowledge, the
6 individuals that were asked to leave were
7 not detained by anyone from Spectaguard at
8 any time inside the mall?
9     A.    Correct.
10     Q.    How about outside the mall,
11 were they detained by anyone from
12 Spectaguard?
13     A.    No.
14     Q.    Now, sir, have you had --
15 withdraw the last question. While you were
16 employed by Spectaguard at the Westfield
17 Trumbull mall, had you had occasion to ask
18 other individuals to leave the premises?
19     A.    Yes.
20     Q.    And every time that you had
21 to ask an individual to leave the premises,
22 did you also have to call the police?
23     A.    No.
24     Q.    Why did you call the police
25 in this incident?

147

1    A.    We were at a failure to
2    comply.  We asked them to leave and it was
3    a refusal by not leaving.
4         Q.    Does that change the
5    situation?
6         A.    Yes, it escalates it to us
7    having to contact the police department.
8         Q.    Is that something that you
9    learned through your employment with
10   Spectaguard?
11        A.    Yes.
12        Q.    Is that something you were
13   trained to do?
14        A.    Correct.
15        Q.    And is that something you do
16   when you sense possible danger?
17        A.    Yes.
18        Q.    So every time that you have
19   to -- withdraw the last question.  Every
20   time that you as a security guard were
21   called upon to ask somebody to leave the
22   premises did not mean that you
23   automatically called the police?
24        A.    That's correct.
25        Q.    And do I understand it to be

148

1  that the police were called in this
2  situation because it was considered to be a
3  dangerous situation?
4      A.    Yes.  Based upon the numbers
5  of the group and the overall of failing to
6  comply completely.
7      Q.    And was it a failure to
8  comply on one occasion?
9      A.    To a sense, yes, when I
10 arrived to the situation I said okay, we're
11 asking you to leave.  We then started to
12 walk but then stopped along the way
13 numerous times before we finally exited the
14 mall.
15     Q.    When you stopped the numerous
16 times, was it you that asked everyone to
17 stop?
18     A.    We did not ask them to stop,
19 they stopped on their own.
20     Q.    What did they do when they
21 stopped?
22     A.    They were either in
23 conversation with us saying why are you
24 following us.  There were select members
25 that may have been looking in stores.

149

```
 1    Because of the nature of the group, I
 2    wasn't able to watch everyone.
 3         Q.   And did -- what you described
 4    as the profanities, did that continue
 5    throughout the 30 to 40 minutes that the
 6    entire incident took place?
 7         A.   Not the entire time.  As soon
 8    as we exited the doors and Trumbull Police
 9    were on scene there, everything sort of
10    calmed down but through the entire walk
11    through the center, there was profanity.
12         Q.   Was it loud?
13         A.   It was loud enough.
14         Q.   Was it the security officers
15    that were being loud?
16         A.   No.
17         Q.   Were you yelling at them?
18         A.   No.
19         Q.   Who was being loud?
20         A.   The group, the individuals of
21    the group, not everyone there was, one or
22    two or three key members of the group.  I
23    believe of the original four.
24         Q.   Can you identify any of those
25    individuals by description?
```

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut  06108
(860) 291-9191      FAX: (860) 528-1972