UNITED STATES DISTRICT COURT    FILED
DISTRICT OF CONNECTICUT

2004 JUL 28 A 10: 56

U.S. DISTRICT COURT
HARTFORD, CT.

| | |
|---|---|
| RICHARD A. MYERS, SHERNETTE CLARK, KENNETH BINGHAM, FLOYD McLEAN<br><br>        Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF TRUMBULL, , OFFICER COPPOLA, I.D. # 24 (first name unknown) (individually and in his official capacity), OFFICER, I.D. #35 (name unknown) (individually and in his official capacity), SPECTAGUARD, MICHAEL (last name unknown), WESTFIELD SHOPPINGTOWN, JOHN DOES 1 through 10, JANE DOES 1 through 10, and ABC Corp. through XYZ, individually, jointly and severally,<br><br>        Defendants. | CASE NO.: 3:03 CV 373 (RNC)<br><br><br><br><br><br><br><br><br><br><br><br>July 26, 2004 |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### I. INTRODUCTION

Plaintiffs filed their complaint, alleging that the above-named defendants along with other defendants conspired with one another to unlawfully detain plaintiffs and further discriminate against plaintiffs by forcing them to leave the Mall based on their race and national origin. Defendants now move for summary judgment to dismiss plaintiffs' causes of actions under 42 U.S.C.

§§ 1983, 1985, 1981, and 2000(a), as well as plaintiffs claim of false imprisonment.

## II. **STATEMENT OF FACTS**

Plaintiffs Richard A. Meyers, Shernette Clark, Kenneth Bingham, and Floyd McLean are all member of the black race and of West Indian decent. (See Second Amended Complaint attached hereto as Exhibit O, at paragraph 14). On the evening of July 31, 2001, at approximately 9:00 p.m., plaintiffs and their friends entered the defendant Mall. Exhibit N, at paragraph 16). The Mall is a shopping center open to the general public for business purposes. (Exhibit O, at paragraph 16). The Mall has various resting areas for weary shoppers and/or browsers, and also provides a court for food purchases. (See Exhibit N, at paragraph 17; Exhibit A, at 173).

After plaintiffs entered the Mall, plaintiffs Meyers and Clark went shopping at Lord & Taylor while plaintiffs Bingham and McLean waited for them in one of the resting areas. (See Exhibit O, at paragraph 18.) While waiting outside of Lord & Taylor, plaintiffs Bingham and McLean were flirting with female patrons. There are no complaints from any female indicating that she was harassed by plaintiffs and their friends. (Exhibit B, at 26-28, 50-51, 68-69; Exhibit C, at 18-19, 83). Plaintiffs Bingham and Mclean were approached by defendant security guards.

2

Prior to approaching plaintiffs and their friends, the defendant security guards were unaware of the specific alleged store complaint which they now contend was the reason that plaintiffs' group was forced to leave the Mall. (Exhibit A, at 76, 101-102). The security guards failed to investigate the alleged store complaint to determine if plaintiffs' group was the source of said complaint and whether plaintiffs' group had broken any Mall rules. (Exhibit A, at 76, 101-02).

Without any prior investigation of the alleged store complaint, which is not substantiated by competent evidence as against plaintiffs' group (See Exhibits I, J, K), the security guards told plaintiffs and their friends that they had to leave the Mall without further explanation. (Exhibit A, at 76, 101-02; Exhibit B, at 34; Exhibit C, at 19-22; Exhibit E, at 33-35, 65, 73; Exhibit D, at 35-36, 87). The security guards made rude comments and used profanities directed towards plaintiffs and their friends. (Exhibit D, at 82-85; Exhibit E, at 84-85, 121-22).

When the security guards first told plaintiffs' group to leave the Mall, they told the security guards that the drivers of the group were inside of Lord & Taylor and that they had to wait on them. (Exhibit B, at 73). While the security guards were telling plaintiffs Bingham and McLean that they had to leave the Mall, plaintiffs Meyers and Clark came out of Lord & Taylor.

3

Although the security guards did not believe that plaintiffs Meyers and Clark had broken any Mall rules, or acted improperly, the security guards told them that they had to leave the Mall when the two attempted to continue shopping. (Exhibit A, 102-04, Exhibit D, at 35-36; Exhibit C, at 39).

During the incident inside of the Mall, plaintiffs and their friends began speaking in Jamaican language and the security guards started getting upset. (Exhibit C, at 42-43). Plaintiffs' group, stating that they were leaving the Mall, attempted to move away from the security guards. (Exhibit C, at 58, 75-76; Exhibit E, at 37; Exhibit B, at 36,93). Plaintiffs and their friends also continued to ask the security guards why they had to leave and received no explanation from the security guards. (Exhibit B, at 34, 69; Exhibit C, at 19-22; Exhibit E, at 33-35, 61, 65, 73, 100; Exhibit D, at 35-36, 87).

Aside from Richard Meyers possibly using the word "hell," Marvin Buntin was the only member of the group to use the word "shit" in response to a rude comment by one of the security guards. Neither of those words, if they are to be considered profanity were directed towards the security guards, but made in response to rude treatment and profane language used by security. (Exhibit B, at 71; Exhibit C, at 55-56; Exhibit A, at 141, Exhibit D, at 62, 64, 82-85, 89, 110, 114). While inside of the Mall, plaintiffs were neither loud, nor disruptive. Plaintiffs

4

merely inquired of the security guards why they had to leave the Mall, and were not given any explanation by the guards. (Exhibit E, at 35, 102, 125; Exhibit B at 71, 75-76; Exhibit D, at 62, 82-85, 89, 110, 114; Exhibit C, at 40-41, 55-56).

As plaintiffs were attempting to leave the Mall, six or eight security guards surrounded plaintiffs and their friends, and herded them to an exit where the defendant police officers, who had been called by the security guards, were waiting for them. The security guards restricted the movement of plaintiffs and their friends while inside of the Mall. (Exhibit C, at 21-22, 44-46, 48-49, 62, Exhibit D, at 35-36, 40; Exhibit E, at 36-37, 62-65, 66-68; Exhibit B, at 34-35). The security guards physically touched plaintiffs' friend Marvin Buntin in order to keep him moving towards the exit along with the rest of the plaintiffs' group. (Exhibit E, at 66; Exhibit B, at 35).

As they were "escorting" plaintiffs out of the Mall, the security guards radioed for police assistance in the removal of eight black males, who were classified as "unwanted persons." (Exhibit G and Exhibit H). After plaintiffs exited the Mall, the police officers unlawfully detained plaintiffs and their friends for a period of approximately 45 minutes to an hour, after the Mall has closed for business and there was no reason for plaintiffs' group to remain on Mall premises. (Exhibit E, at 47; Exhibit B, at 41; Exhibit C, at 29, Exhibit D, at 45-46).

5

The police officers record checked everyone's identification, and escorted at least two plaintiffs to their car in order to retrieve their identification.  The officers also directed plaintiffs to "shut up" and "sit down", and refused to answer any questions from plaintiffs and their friends.  The police officers further threatened plaintiffs and their friends with arrest, and also told them that if they ever came back to the Mall that they would be arrested.  (Exhibit A, at 19-21; Exhibit E, at 37, 68; Exhibit B, at 40, 42, 44-45, 47, 49; Exhibit C, at 25; Exhibit D, at 43, 45, 48).

In order to hide their behavior, the defendant officers falsified their police report to indicate that they had absolutely no contact with plaintiffs' group.  The officers also covered their badges so that plaintiffs could not identify them. (Exhibit A, at 19-21, 126-27, 130; Exhibit E, at 43-45; Exhibit H).

Once plaintiffs and their friends were outside of the Mall, one of the security guards told plaintiff Richard Meyer that they had broken the Mall rules of being in a group of more than seven and being "loud and talking in the hallway.  Plaintiffs' group was not loud and they were grouped in seven only because the security guards surrounded them and herded them to an exit were the defendant police officers were waiting for them.  (Exhibit E, at 36-37, 62-65, 66-68, 102, 125; Exhibit B, at 34-35, 76;

6

Exhibit D, at 35-36, 114, 118; Exhibit C, at 21-22, 44-46, 48-49, 62).

Plaintiffs were discriminated against based on their race and national origin in that they were treated differently from similarly situated white individuals and were targeted because of the color of their skin and their accents. (Exhibit E, at 126-28; Exhibit D, at 47-48, 87; Exhibit C, at 42-43; Exhibit B, at 86). Plaintiffs filed timely notice to the Commission of Human Rights and Opportunities. (Attorney Certification attached hereto as Exhibit L.).

Defendant Michael Hokanson testified that he reviewed Matthew Wilkens' and Stephanie Caldwell's reports of alleged complaints against plaintiffs in the same week of the incident, July 31, 2001. (Exhibit A, at 121-22). However, the statement of Matthew Wilkens is dated August 29, 2001. (Exhibit I). The Statement of Stephanie Caldwell is not dated, but marked received on October 4, 2002. (Exhibit J).

Investigating Officer Fernando Torres, who investigated the alleged store complaints from Wilkens and Caldwell, and prepared an incident report with respect to same (Exhibit K), has refused to cooperate during the discovery process and now is no longer employed by Spectaguard. (Exhibit M). None of the witnesses that have knowledge about the alleged store complaints are available for depositions and their whereabouts are unknown.

The defendant police officers have received no training with respect to "racial profiling" and/or "bias sensitivity. (Township of Trumbull's Answers to Interrogatories, attached hereto to as Exhibit N).   The security guards were agents of the Mall in the enforcement of Mall rules.   (Exhibit F, at Paragraph 2; Exhibit A, at 49-51).   Plaintiffs have suffered emotional damages as a result of the incident.   (Exhibit E, at 50-53; Exhibit B, at 55, 85; Exhibit C, at 31, 63-65; Exhibit D, at 96-103).

## III. <u>LAW AND ARGUMENT</u>

A.  <u>Standard for Summary Judgment</u>

Entry of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>See</u> Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if the evidence is such that a "reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The moving party has the initial burden of demonstrating that no genuine issue of material fact exists.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Thereafter, the burden shifts to the non-moving party to show that a genuine issue of material fact exists for the purpose of trial.  <u>Id</u>. at 324.  Any inference to be drawn from the proffered evidence must be viewed in the light most favorable to the non-moving party. <u>Id</u>.

Here, defendants' summary judgment motion should be denied.

B.  <u>The Defendant Security Guards were Agents of the Mall</u>

"Under Connecticut law, 'agency' is defined as 'the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his

9

behalf and subject to his control, and consent by the other so to act.'" <u>Menzie v. Windham Community Hospital,et al.</u>, 774 F. Supp. 91, 94 (D. Conn. 1991).

"By contrast, an 'independent contractor' is 'one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without subject to the control of his employer, except as to the result of his work.'" <u>Id</u>. "Liability will generally not be imposed on the employer for the negligence of an independent contractor because of the absence of the right to control." <u>Id</u>. One of the factors to be considered in determining the right to control is "whether the parties intended to form an agency relationship and thus the 'operative terms' of any agreement between the parties should be examined." <u>Id</u>.

Here, the defendant Mall adopted an agency relationship with the defendant security guards through the Trumbull Shopping Park Rules of Conduct ("Rules of Conduct"). (Exhibit F). That Rules of Conduct, which was provided to the general public as Mall policy at the time of the incident, specifically states that "the security department and security officers are empowered to enforce these policies as agents of the property owners." (Exhibit F, at paragraph 2; Exhibit A, at 46, 50-51).

Furthermore, defendant Michael Hokanson testified that as an employee of Spectaguard, he was an agent of the Mall. (Exhibit

A, at 50). The Rules of Conduct also provide that "Management reserved the right to revoke the implied consent extended to all invitees for violation of policies and may eject or bar any persons for conduct that is illegal, unsafe, or unacceptable behavior within community standards." (Exhibit F, at paragraph 1). The Rules of Conduct further indicate that Management determines the type of activity that violates store policy. (Exhibit F, at 1, 2, and 3).

Based on the plain written meaning of the Rules of Conduct, it is clear that the Rules of Conduct are policies adopted by the Mall, and that the defendant security guards were agents of the Mall with respect to the enforcement of those policies.[1] Therefore, the Mall should be held liable for the security guard's enforcement of those rules in a discriminatory manner as well as the treatment of plaintiffs as a result of said enforcement. Thus, defendant's motion for summary judgment with respect to plaintiffs federal and state claims as against the Spectaguard defendants should be denied.


C.  **Plaintiffs Provided Timely Written Notice and the Mall is a Public Accommodation.**

Section 2000a-6(a) of the title 42 of the United States Code

---

[1]Another factor to be considered in determining the right to control is 'independent ownership of a substantial enterprise." Menzie, at 94. However, defendant Westfield Shopping Trumbull did not set forth any facts with respect to this issue. See Westfield Shoppingtown Trumbull's Local Rule 56(a)(1) statement.

provides that the "district courts of the United States shall

have jurisdiction of proceedings instituted pursuant to this

title and shall exercise the same without regard to whether the

aggrieved party shall have exhausted any administrative or other

remedies that may be provided by law.   42 U.S.C. § 2000a-6(a).

Notwithstanding the provisions of Section 2000a-6(a), the

statute further states that:

> [i]n the case of an alleged act or practice
> prohibited by this subchapter which occurs in a State,
> or political subdivision of a State, which has a State
> or local law prohibiting such act or practice and
> establishing or authorizing a State or local authority
> to grant or seek relief from such practice or to
> institute criminal proceedings with respect thereto
> upon receiving notice thereof, no civil action may be
> brought under subsection (a) of this section before the
> expiration of thirty days after written notice of such
> alleged act or practice has been given to the
> appropriate State or local authority by registered mail
> or in person, provided that the court may stay
> proceedings in such civil action pending the
> termination of State or local enforcement proceedings.

42 U.S.C § 2000a-3(c).

Here, plaintiffs filed timely written notice to the

appropriate state agency prior to filing their complaint in

federal court.   However, proof of said notice was subsequently

misplaced due to extensive reconstruction in the office of

plaintiffs' counsel.   See Attorney Certification attached hereto

as Exhibit L.   Plaintiffs have been unable to confirm receipt of

notice through the State agency.   See Exhibit L.

Because the written notice requirement was met, but proof of

12

same was misplaced due to human error, plaintiffs respectfully request the Court to consider their claim under 42 U.S.C. § 2000(a).[2]

<u>Public Accommodation</u>

Section 2000(a) of title 42 United States Code provides:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, ad defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

42 U.S.C. § 2000(a).

Section 2000a(b) of title 42 of the United State Code provides in part:

> Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action: (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence; (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises of any retail establishment; or any gasoline station; (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and (4) any

---

[2] <u>See</u> <u>Robinson v. Power Pizza, Inc.</u>, 993 F. Supp. 1458, 1461 (M. D. Fla.. 1998) (where plaintiff failed to file timely written notice Court noted that "Plaintiffs could easily have complied with the notice requirement before they filed their Complaint and anytime since they filed their complaint.").

> establishment (A)(i) which is physically located within a premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b).

Under section 2000a(b), "the list of covered establishments traditionally has been construed broadly." Halton, et al. v. Great Clips, Inc., et al., 94 F.Supp.2d 856, 861-62 (N.D. Ohio 2000). Here, the defendant Mall owns and operates a shopping center that has a food court physically located on its premises. The food court is open to the general public for food consumption. Therefore, the Mall falls within the contemplation of sections 2000a(b)(2), 2000a(b)(4)(A)(i)and(ii), and 2000a(b)(4)(B). See e.g. Halston, et al., at 863 ("Court reads the language of that portion of statute to mean within the actual physical boundaries of a particular establishment is located a covered establishment."). See also Chu v. Gordmans, 2002 U.S. Dist. LEXIS 26623 (D. Neb., April 12, 2002) ("retail stores generally are not considered places of public accommodation under Title II, but that retail stores may be covered under Title II if the retail stores include on their premises another establishment that is a place of accommodation under the Act.").

Based on the foregoing, the defendant Mall is a place of public accommodation.

14