D.  <u>Plaintiffs have Established a Prima Facie Case under 42 U.S.C. § 1981</u>.

Section 1981 of title 42 of the United States Code provides that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind and to no other.

42 U.S.C. § 1981.

In order to establish a cause of action under section 1981, plaintiffs must show "'(1) membership in a racial minority group; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute.'" <u>Felton v. Maines Cash & Carry, Inc. et al.</u>, 2001 U.S. Dist. LEXIS 1118 (N.D.N.Y., February 2, 2001).

Here, plaintiffs have met their burden with respect to each element. With respect to the first prong, it is not disputed that plaintiffs are members of the black race and of West Indian descent. With respect to the second prong, plaintiffs have established sufficient facts to support an intention by defendants to discriminate on the basis of race and national origin.

"Absent direct evidence of discrimination the burden-

15

shifting approach for inferential proof of discrimination . . .is used in cases alleging a violation of 42 U.S.C. § 1981. Halton, et al., at 865, citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) and McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "In this burden-shifting analysis: (1) the plaintiff must establish a prima facie case of racial discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; (3) the plaintiff must prove that the stated [reason] was in fact pretextual." Id.

Here, Plaintiffs has sufficiently established that they were discriminated against based on their race and national origin in that they were treated differently from similarly situated white individuals and were targeted because of their color and Jamaican accents. (Exhibit E, at 126-28; Exhibit D, at 47-48, 87; Exhibit C, at 42-43; Exhibit B, at 86).

While waiting outside of Lord & Taylor, plaintiffs' group was flirting with female patrons. There are no complaints from any females indicating that they were harassed by plaintiffs and their friends. (Exhibit B, at 26-28, 50-51, 68-69; Exhibit C, at 18-19, 83).

When the security guards first told plaintiffs to leave the Mall, they told the security guards that the drivers of the group were inside of Lord & Taylor and that they had to wait on them.

16

(Exhibit B, at 73). Plaintiffs and their friends asked the security guards why they had to leave and received no explanation from the security guards. (Exhibit B, at 34, 69; Exhibit C, at 19-22; Exhibit E, at 33-35, 61, 65, 73, 100; Exhibit D, at 35-36, 87).

While inside of the Mall, plaintiffs were neither loud, nor disruptive. Plaintiffs merely inquired of the security guards why they had to leave the Mall, and were not given an explanation by the guards. (Exhibit E, at 35, 102, 125; Exhibit B at 71, 75-76; Exhibit D, at 62, 82-85, 89, 110, 114; Exhibit C, at 40-41, 55-56). Instead, the security guards made rude comments and used profanities directed towards plaintiffs and their friends. (Exhibit D, at 82-85; Exhibit E, at 84-85, 121-22).

Aside from Richard Meyers possibly using the word "hell," Marvin Buntin was the only member of the group to use the word "shit" in response to a rude comment by one of the security guards. Neither of those words, if they are to be considered profanity were directed towards the security guards, but made in response to rude treatment and profane language used by security. (Exhibit B, at 71; Exhibit C, at 55-56; Exhibit A, at 141, Exhibit D, at 62, 64, 82-85, 89, 110, 114). During the incident inside of the Mall, plaintiffs and their friends began speaking in Jamaican language and the security guards started getting upset. (Exhibit C, at 42-43).

17

Although the security guards admit that plaintiffs Meyers and Clark had not broken any Mall rules or acted improperly, the security guards told them that they had to leave the Mall when the two attempted to continue shopping. (Exhibit A, 102-04, Exhibit D, at 35-36; Exhibit C, at 39). When plaintiffs' group, stating that they were leaving the Mall, attempted to move away from the security guards (Exhibit C, at 58, 75-76; Exhibit E, at 37; Exhibit B, at 36,93; Exhibit A, at 160), six or eight security guards surrounded plaintiffs and their friends, and herded them to an exit where the defendant police officers were waiting for them. (Exhibit C, at 21-22, 44-46, 48-49, 62, Exhibit D, at 35-36, 40; Exhibit E, at 36-37, 62-65, 66-68; Exhibit B, at 34-35).

The security guards had radioed for police assistance in the removal of eight black males, who were classified as "unwanted persons." When the police arrived, the security guards told them that "eight black males were told to leave the Mall." (Exhibit G and Exhibit H).

Once plaintiffs and their friends were outside of the Mall, one of the security guards told plaintiff Richard Meyer that they had broken the Mall rules of being in a group of more than seven and being "loud and talking in the hallway. (Exhibit E, at 38). However, plaintiffs' group was not loud and they were grouped in seven only because the security guards surrounded them and herded

18

them to an exit were the defendant police officers, who had been directed to that same exit by the security guards, were waiting for them. (Exhibit E, at 36-37, 62-65, 66-68, 102, 125; Exhibit B, at 34-35, 76; Exhibit D, at 35-36, 114, 118; Exhibit C, at 21-22, 44-46, 48-49, 62; Exhibit A, at 11-15, 173-74).

The police officers unlawfully detained plaintiffs and their friends for a period of approximately 45 minutes to an hour, after the Mall had closed for business and there was no reason for plaintiffs' group to remain on Mall premises. (Exhibit E, at 47; Exhibit B, at 41; Exhibit C, at 29, Exhibit D, at 45-46). The officers record checked everyone's identification, and escorted at least two plaintiffs to their car in order to retrieve their identification. The officers also directed plaintiffs to "shut up" and "sit down", and refused to answer any questions from plaintiffs and their friends. The officers further threatened plaintiffs and their friends with arrest, and further told them that if they ever came back to the Mall that they would be arrested. (Exhibit A, at 19-21; Exhibit E, at 37, 68; Exhibit B, at 40, 42, 44-45, 47, 49; Exhibit C, at 25; Exhibit D, at 43, 45, 48).

In order to hide their behavior, the defendant officers falsified their police report to indicate that they had absolutely no contact with plaintiffs' group. The officers also covered their badges so that plaintiffs could not identify them.

19

(Exhibit A, at 19-21, 126-27, 130; Exhibit E, at 43-45; Exhibit H).

The defendant security guards contend that the reason they forced plaintiffs to leave the Mall was because they had received a store complaint involving plaintiffs, that plaintiffs were in a group of seven and that they were loud. However, prior to approaching plaintiffs and their friends, the defendant security guards were unaware of the specific alleged store complaint which they now contend was the reason that plaintiffs' group was forced to leave the Mall. (Exhibit A, at 76, 101-102).

Prior to approaching plaintiffs and their friends, the security guards failed to investigate the alleged store complaint to determine if plaintiffs' group was the source of said complaint and whether plaintiffs' group had broken any Mall rules. (Exhibit A, at 76, 101-02).

Without any prior investigation of the alleged store complaint, which is not substantiated by competent evidence as against plaintiffs' group (See Exhibits I, J, K), the security guards told plaintiffs and their friends that they had to leave the Mall without further explanation. (Exhibit A, at 76, 101-02; Exhibit B, at 34; Exhibit C, at 19-22; Exhibit E, at 33-35, 65, 73; Exhibit D, at 35-36, 87).

With respect to the alleged store complaints, the Statement of Matthew Wilkens is dated August 29, 2001. (Exhibit I). The

20

Statement of Stephanie Caldwell is not dated, but marked received on October 4, 2002. (Exhibit J). However, defendant Michael Hokanson testified that he reviewed Wilkens' and Caldwell's reports within the week of the incident, July 31, 2001. (Exhibit A, at 121-22). At the time of the incident, a copy of the Mall rules were not posted, but were available for review at customer services. (Exhibit A, at 46). Therefore, plaintiffs were unaware of the activity that would violate Mall policy and the security guards, after approaching them while inside of the Mall, never advised them accordingly.

Moreover, Officer Fernando Torres, who investigated the alleged store complaints and prepared an incident report with respect to same (Exhibit K), has refused to cooperate during the discovery process and now is no longer employed by Spectaguard. (Exhibit M). In fact, none of the witnesses that have knowledge about the alleged store complaints were available for depositions and their whereabouts are unknown. Thus, defendants cannot even establish the existence of a store complaint and a jury could reasonably infer that no such complaint existed at the time plaintiffs were approached.

Morever, plaintiffs deny that they were loud or disruptive and further assert that the only reason they were in a group of seven was because the security guards surrounded them and would not allow them to separate. Plaintiffs further contend that the security guards violated Mall rules in that they created a

21

disruptive atmosphere by telling plaintiffs to leave without explanation, made rude comments and cursed at plaintiffs, and that six to seven security guards unnecessarily "escorted" plaintiffs out of the Mall, when plaintiffs indicated that they would leave on their own accord. The only reason for the security guards actions was that they wanted eight black individuals out of the Mall. Based on the foregoing, plaintiffs have satisfied their burden of intentional discrimination.

With respect to the third prong of section 1981, plaintiffs must prove discrimination concerning one or more of the activities enumerated in the statute. Here, plaintiffs base their section 1981 claim on the "equal benefit" clause of section 1981. A claim of false imprisonment and/or false arrest is cognizable under section 1981's "equal benefit" clause. See Felton v. Maines Cash & Carry, Inc., 2001 U.S. Dist. LEXIS 1118 (N.D.N.Y., February 2, 2001); see also Phillip et al. v. University of Rochester, et al., 316 F.3d 291 (2d Cir. 2003).

"[F]alse imprisonment is the unlawful restraint by one person of the physical liberty of another." Rivera v. Double A Transportation, Inc., 248 Conn. 21, 31, 727 A.2d 204 (1999). To prevail on a claim of false imprisonment, plaintiffs must show that their "physical liberty has been restrained by the defendant[s] and that the restraint was against [their] will, that is that [they] did not consent to the restraint or acquiesce in it willingly." Berry v. Loiseau, 223 Conn 786, 820 (1992).

22

"A person is not liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." Id. "Nothing less than a rather extreme brand of recklessness will substitute for the standard requirement of intention in false imprisonment cases. Id.

Here, it is clear from the actions of both the security guards and the police officers that their intention was to unlawfully restrict the liberty of plaintiffs and otherwise confine them. After telling plaintiffs that they had to leave the Mall for no reason, six or eight security guards surrounded plaintiffs and their friends, and herded them to an exit where the defendant police officers, who had been directed to the same exit by the security guards, were waiting for them. (Exhibit C, at 21-22, 44-46, 48-49, 62, Exhibit D, at 35-36, 40; Exhibit E, at 36-37, 62-65, 66-68; Exhibit B, at 34-35; Exhibit A, at 11-15, 173-74).

The security guards physically touched Marvin Buntin in order to keep him with the rest of the group as they were "escorted" to the exit. (Exhibit E, at 66; Exhibit B, at 35). Even though security guards admitted that plaintiffs Meyers and Clark had not broken any Mall rules, or acted improperly, the security guards stopped them from going into a store, and forced them to be "escorted" out of the Mall with the rest of the group. (Exhibit A, 102-04, Exhibit D, at 35-36, Exhibit C, at 39). The

23

escort lasted approximately twenty to thirty minutes. (Exhibit C, at 22-23; Exhibit B, at 37-38).

Once outside of the Mall, the police officers further restricted the liberty of plaintiffs by detaining them for an additional 45 minutes to an hour, after the Mall has closed for business and there was no reason for plaintiffs' group to remain on Mall premises. (Exhibit E, at 47; Exhibit B, at 41; Exhibit C, at 29, Exhibit D, at 45-46). Plaintiffs did not consent to the restraint of their physical liberty by the security guards or the police officers. (Exhibit E, at 66, 131; Exhibit C, at 39, 58, 75-76; Exhibit E, at 37; Exhibit B, at 35-36, 93; Exhibit D, at 35-36).

Furthermore, defendants' actions against plaintiffs were done for no lawful purpose. As previously discussed, plaintiffs deny that they broke any Rule Malls, or that they even refused to leave the Mall after being directed to do so and that the reasons asserted by the security guards for forcing them to leave the Mall in the first instance, were not legitimate. In fact, a reasonable jury could infer that they did not even exist. See supra, section D at pages 15-22. From this, a reasonable jury could conclude further that the security guards' actions were indeed unlawful because they were motivated by discriminatory intent.

With respect to the police officers, they clearly had no lawful purpose for detaining plaintiffs outside of the Mall and

24

record checking them. By their own admission, the officers had been summoned to the Mall because the security guards wanted assistance in the removal of unwanted persons. When the police officers arrived, the security guards told them that they wanted 8 black males out of the Mall. At that point, plaintiffs' group was already outside of the Mall attempting to leave as directed. Based on those facts, there was nothing for the officers to investigate in relation to any possible criminal activity.

Therefore, a jury reasonably could find that the officers' actions in detaining plaintiffs for almost an hour, record checking them, refusing to answer their questions, ordering them to "sit down" and "shut up", and threatening them with arrest if they did not comply, were in furtherance of a plan by defendants to discriminate against plaintiffs, and that the actions of those police officers were not only unlawful but unreasonable under the under the circumstances.

E. The 4th Amendment and 42 U.S.C. § 1983

"In order for a claim to be stated under section 1983, the conduct complained of must have been done under color of state law, and additionally, the conduct must have deprived Plaintiff of some right, privilege or immunity secured by the Constitution." Palumbo v. Orr, 579 F.Supp. 129, 133 (WD Pa 1984), citing Parratt v. Taylor, 451 U.S. 527 (1981). At the time of the incident, the police officers were acting in their

capacity as employees of the Trumbull Police Department. The police officers subjected plaintiffs to an false arrest and kicked them out of the Mall, a place of public accommodation.[3]

"The Fourth Amendment right to be free from unreasonable searches and seizures is applicable to state officers through the Fourteenth Amendment . . . . [T]he Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime-'arrest' in traditional terminology." Barstow v. Shea, 196 F. Supp.2d 141, 147, (D. Conn 2002). "A 'seizure' occurs where, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id. Here, it is clear that plaintiffs were not free to leave once the defendant officers detained them outside the Mall by telling them to "shut up" and "sit down."

"The 'question then becomes whether the seizure was reasonable under the circumstances.'" Id. As previously discussed, under the section 1981 argument, see supra, at section D, pages 22-25, the police officers had no lawful purpose for detaining plaintiffs outside of the Mall and record checking them. By their own admission, the officers had been summoned to the Mall because the security guards wanted assistance in the removal of unwanted persons. (Exhibits G and H). When the

---

[3] With respect to pubic accommodation discussion, see supra, section C.

26

police officers arrived, the security guards told them that they wanted 8 black males out of the Mall. (Exhibits G and H).

At that point, plaintiffs' group was already outside of the Mall attempting to leave as directed. (Exhibit E, at 131). Based on those facts, there was nothing for the officers to investigate in relation to any possible criminal activity, and the defendant security guards have not alleged that plaintiffs were engaging in criminal activity, but instead claim that plaintiffs were kicked out of the Mall for violating the Rules of Conduct.

Therefore, a jury reasonably could find that the officers' actions in detaining plaintiffs for almost an hour, record checking them, refusing to answer their questions, ordering them to "sit down" and "shut up", and threatening them with arrest if they did not comply, were not reasonable under the under the circumstances.

F. <u>Qualified Immunity</u>

The defendant police officers contend that they are entitled to qualified immunity from the claims against them. "The defense of qualified immunity shields government agents 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Smith v. City of New Haven, et al.</u>, 166 F. Supp. 2d 636, 641 (D. Conn. 2001), <u>citing</u>, <u>McEvoy</u>

v. Spencer, 124 F.3d 92, 97 (2nd Cir. 1997), quoting, Harlow v. Fitzgerald, 457 U.S. 800 (1982).

"'The qualified immunity defense may be upheld as a matter of law when the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all reasonable inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that she was acting in a fashion that did not violate such a right.'" Barstow, at 149, quoting Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996).

Here, the right to be free from false arrest and unreasonable seizures are clearly well established common law and constitutional rights of which a reasonable person would have been aware at the time of the incident. Moreover, a rational jury could conclude that it was not objectively reasonable for the police officers to detain plaintiffs as they were attempting to leave the Mall.

As previously discussed, under the section 1981 argument, see supra, at section D, pages 22-25, the police officers had no lawful purpose for detaining plaintiffs outside of the Mall and record checking them. By their own admission, the officers had been summoned to the Mall because the security guards wanted assistance in the removal of unwanted persons. (Exhibits G and H). When the police officers arrived, the security guards told them that they wanted 8 black males out of the Mall. (Exhibits G

28

and H).

At that point, plaintiffs' group was already outside of the Mall attempting to leave as directed. (Exhibit E, at 131). At that point, there was nothing for the officers to investigate in relation to any possible criminal activity, and the defendant security guards, then and now, have not alleged that plaintiffs were engaging in criminal activity, but instead claim that plaintiffs were kicked out of the Mall for violating the Rules of Conduct.

Therefore, a jury rational jury can find that the officers could not have objectively believed by detaining plaintiffs for almost an hour, record checking them, refusing to answer their questions, ordering them to "sit down" and "shut up", and threatening them with arrest if they did not comply, that they were not violating the rights of plaintiffs to be free of false arrest, unreasonable seizure, and discriminatory treatment. The fact that the officers falsified their police report to indicate that they had absolutely no contact with plaintiffs' group and further covered their badges so that plaintiffs could not identify them (Exhibit A, at 19-21, 126-27, 130; Exhibit E, at 43-45; Exhibit H), is further evidence that the police officers knew that they were violating the rights of plaintiffs.

G. <u>Plaintiff Section 1985 Claims</u>

Section 1985(3) of Title 42 of the United States Code

29

provides in pertinent part:

> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws; . . . in any case of a conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury, deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

To make out a violation under section 1985, plaintiffs must allege a "(1) conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bd of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983). "[T]he conspiracy not only must have as its purpose the deprivation of 'equal protection of the laws, or of equal privileges and immunities under the law,' but also must be motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions.'" Id. at 829.

Plaintiffs have already established racial animus. See

30

supra, section D, pages 15-22. With respect to the existence of a conspiracy, when plaintiffs' group, stating that they were leaving the Mall, attempted to move away from the security guards (Exhibit C, at 58, 75-76; Exhibit E, at 37; Exhibit B, at 36,93; Exhibit A, at 160), six or eight security guards surrounded plaintiffs and their friends, and herded them to an exit where the defendant police officers, who previously had been directed to the same exit by the security guards, were waiting for them. (Exhibit C, at 21-22, 44-46, 48-49, 62, Exhibit D, at 35-36, 40; Exhibit E, at 36-37, 62-65, 66-68; Exhibit B, at 34-35; Exhibit A, at 11-15, 173-74). The security guards restricted the movement of plaintiffs and delivered them to the police who had been previously summoned by the security guards and were waiting outside of the Mall for plaintiffs.

The security guards had radioed for police assistance in the removal of eight black males, who were classified as "unwanted persons." When the police arrived, the security guards told them that "eight black males were told to leave the Mall." (Exhibit G and Exhibit H). Once outside of the Mall, the police officers further restricted the liberty of plaintiffs, who were attempting to leave, by detaining them for an additional 45 minutes to an hour after the Mall has closed for business and there was no reason for plaintiffs' group to remain on Mall premises. (Exhibit E, at 47; Exhibit B, at 41; Exhibit C, at 29, Exhibit D, at 45-46). After the police officer detained plaintiffs, they

31

then ordered plaintiffs to leave the Mall and not come back under threat of arrest.

From this, a reasonable jury could conclude that the defendant security guards and police officers entered into an agreement to discriminate against defendants by unlawfully restricting their freedom and denying them access to a public accommodation.

## IV. CONCLUSION

Based on the foregoing, defendants' motion should be dismissed.

> Hunt, Hamlin & Ridley
> Attorneys for Plaintiffs
>
> By: _____
> Cynthia H. Hardaway
> Hunt, Hamlin & Ridley
> 60 Park Place, 16th Floor
> Newark, New Jersey 07102
> Tel. (973) 242-4471
> Fed. Bar No.: CT24752

cc: Louis N. George, Esq.
    Michael T. McCormack, Esq.
    Robert J. Flanagan, Jr.

## CERTIFICATION OF MAILING

This is to certify that, on this 26th day of July 2004, an original of the foregoing has been sent via federal express to the Clerk of the United States District Court and via regular mail to the following counsel of record:

Stuart E. Brown
Hasset & George, P.C.
555 Franklin Avenue
Hartford, Connecticut 06114

Michael T. McCormack
Tyler, Cooper & Alcorn, LLP
185 Asylum Street
Cityplace I 35th Floor
Hartford, CT 06103-3802

Robert J. Flanagan, Jr.
Cella, Flanagan & Weber, P.C.
21 Washington Avenue
P.O. Box 221
North Haven, CT 06473-0221

By: _____
Cynthia H. Hardaway

DATED: July 26, 2004